Submitted September 24, 2013; resubmitted en banc January 7, reversed and remanded August 6, 2014, petition for review allowed January 9, 2015 (356 Or 685)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ROMAN LANCE SUPPAH,
*Defendant-Appellant.*

Sherman County Circuit Court
100016CT; A149412

334 P3d 463

Peter Gartlan, Chief Defender, and Laura E. Coffin, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Le igh A. Salmon, Assistant Attorney General, filed the brief for respondent.

Before Haselton, Chief Judge, and Armstrong, Wollheim, Ortega, Sercombe, Duncan, Nakamoto, Hadlock, Egan, DeVore, Tookey, Garrett, Judges, and Schuman, Senior Judge.

DUNCAN, J.

Hadlock, J., dissenting.

## DUNCAN, J.

In this criminal case, defendant appeals a judgment of conviction for giving false information to a police officer, ORS 807.620,[1] assigning error to the trial court's denial of his motion to suppress evidence obtained during and after a traffic stop. He contends that the stop violated his rights under Article I, section 9, of the Oregon Constitution[2] because it was not supported by probable cause, and he further contends that that violation tainted the evidence that he moved to suppress. The state does not dispute that the stop violated defendant's constitutional rights, but argues that the violation did not taint the evidence. Because we conclude that the violation tainted the evidence obtained during the stop and that admission of that evidence was prejudicial, we reverse and remand.

## I. HISTORICAL AND PROCEDURAL FACTS

The relevant facts are undisputed. On July 14, 2010, defendant was driving a purple Cadillac on Interstate 84. Sherman County Deputy Sheriff Hulke pulled defendant over.

At the hearing on defendant's motion to suppress, Hulke testified that he stopped defendant for a traffic violation, but that he could not recall what the violation was. Hulke testified that it was the type of violation for which he would usually issue a warning to a driver; but Hulke did not issue a warning to defendant. Defendant's uncontradicted testimony was that Hulke did not inform him of the reason for the stop. Although, in his motion to suppress, defendant specifically asserted that there was no evidence that Hulke had a reason to stop him, the state did not respond by

---

[1] ORS 807.620(1) provides: "A person commits the offense of giving false information to a police officer if the person knowingly uses or gives a false or fictitious name, address or date of birth to any police officer who is enforcing motor vehicle laws." ORS 807.620(2) provides that the offense is a Class A misdemeanor.

[2] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

presenting any evidence—such as a dispatch record or police report—that Hulke had ever given notice of, or recorded, any reason for the stop.[3]

During the stop, Hulke asked defendant for his name and defendant gave the name "Harold Pennington," which is the name of one of defendant's friends. Hulke ran Pennington's name through dispatch, learned that Pennington's driver's license was suspended, and issued defendant a traffic citation in Pennington's name for driving while suspended and—because defendant had been unable to provide proof of insurance—for driving uninsured.

Approximately one month later, defendant informed a staff member of the district attorney's office that he had given a false name during the traffic stop. Thereafter, Sherman County Deputy Sheriff Shull telephoned defendant and obtained an oral statement. Defendant told Shull that he had given a false name because he did not have a valid license at the time of the stop and he did not want the car, which belonged to his girlfriend, to be towed. Defendant also told Shull that he had given Pennington's name because he had thought that Pennington had a valid license, and that he wanted to make sure that Pennington "didn't get in trouble." Shull asked defendant to go to his local police department and complete a written statement. Defendant did so, and the police department sent the statement to Shull. Thereafter, the state charged defendant with giving false information to a police officer based on his statements during the traffic stop.

Defendant moved to suppress the evidence obtained during and after the traffic stop. In his written motion, defendant moved to suppress "the seizure and identification of Defendant, any statements or admissions made by Defendant, all observations of Defendant, all evidence

---

[3] In his written motion to suppress, defendant asserted that there was no evidence that Hulke had a reason to stop him. He also pointed out that the citation that Hulke had issued was for offenses that Hulke discovered only after stopping him, specifically, driving while suspended and driving uninsured. Defendant filed his motion more than two months before the hearing on it was held. Thus, the state had notice of the need to present, and an opportunity to present, any evidence that may have existed to establish that Hulke had a reason to stop defendant.

including identification, seized from Defendant and/or the vehicle in which he was driving on July 14, 2010." Defendant asserted that Hulke "pull[ed] [him] over without cause and ask[ed] for [his] identification" and that doing so "constitute[d] an unlawful seizure similar to the one struck down in *State v. Toevs*, 327 Or 525, 964 P2d 1007 (1998)." Defendant further asserted that, because the stop was unlawful, the evidence obtained as a result of the stop had to be suppressed under the "attenuation analysis delineated in [*State v. Hall*, 339 Or 7, 115 P3d 908 (2005)]." Similarly, at the hearing on his motion, defendant argued that the evidence obtained during and after the traffic stop had to be suppressed under *Hall*. Defendant argued that the evidence was "directly tied to that stop" and that there was "no factual attenuation" between the stop and the discovery of the evidence.

The state did not dispute that Hulke had stopped defendant unlawfully. But, the state argued that the causal connection between the unlawful stop and the discovery of the evidence was attenuated. The state's theory regarding the statements that defendant made *during* the stop was that the statements were attenuated from the stop because defendant made them because "[h]e didn't want to get his girlfriend's car towed." The state's theory regarding the statements that defendant made *after* the stop was that they were attenuated from the stop because defendant volunteered them a month after the stop and because he made them "so his friend wouldn't get in trouble."

Accepting the state's arguments, the trial court stated:

"I'm going to deny the Motion to Suppress. I'm going to find the stop was illegal, but the conduct of the Defendant was independent in his own decision to notify the police that he gave a wrong name. And to keep his friend out of trouble[,] as well as having the car towed * * *[.] I'm also going to find there was a substantial attenuation of the time frame in which this took place."

After the denial of his motion to suppress, defendant waived his right to a jury trial, and the court acquitted him of driving while suspended, but convicted him of giving false information to a police officer. Defendant appeals.

## II. ARGUMENTS ON APPEAL

As mentioned, defendant assigns error to the denial of his motion to suppress the evidence obtained as a result of the illegal stop. He renews his argument that, under the exclusionary rule of Article I, section 9, the evidence is inadmissible because it is the unattenuated product of the illegal stop. His argument focuses on the admissibility of his statements, both the oral statements that he made during the stop and the oral and written statements that he made one month after the stop.[4] He asserts that all of the statements were erroneously admitted, but that, even if the later statements were properly admitted, the erroneous admission of the earlier statements was harmful because, without the earlier statements, the later statements would not have been corroborated and the state would not have been able to prove that he committed the crime of giving false information to a police officer. *See* ORS 136.425 (generally, a "confession alone is not sufficient to warrant the conviction of the defendant without some other proof that the crime has been committed").[5]

In response, the state argues that all of defendant's statements were properly admitted because the causal connection between the stop and the statements is attenuated. The state acknowledges that the stop made it possible for Hulke to question defendant and that defendant's statements during the stop were in response to Hulke's questioning, but contends that the statements are admissible because defendant chose to give a false name. According to the state, "defendant's unilateral, voluntary decision to lie about his identity attenuated the 'discovery' of the evidence from the prior illegality." The state also argues, for the first time on appeal, that defendant's statements are

[4] Although defendant moved to suppress all evidence obtained as a result of the unlawful stop, including any "observations of Defendant," defendant's appellate argument focuses on the admissibility of his statements. In passing, he asserts that evidence of "defendant's appearance, conduct and statements in the Cadillac were obtained in violation of Article I, section 9," but he does not make any argument based on Hulke's observation of defendant's appearance.

[5] As discussed below, the state's only argument on appeal is that Hulke "did not exploit any *** illegality." The state does not dispute defendant's assertion that, if the statements he made during the stop were erroneously admitted, reversal is required.

admissible because they are evidence of a "new independent crime—providing false information to a police officer." As support for that argument, the state relies on an exception to the exclusionary rule that applies to evidence of "independent crimes directed at officers who illegally stop, frisk, arrest or search," *State v. Gaffney*, 36 Or App 105, 108, 583 P2d 582 (1978), *rev den*, 285 Or 195 (1979), but the state acknowledges that "this case does not present the same type of officer-safety concerns" as the cases in which we have applied the *Gaffney* exception.

## III.  DISCUSSION

### A.  *The History and Purpose of Oregon's Exclusionary Rule*

Article I, section 9, protects individuals from unreasonable government searches and seizures. It prohibits government officers from interfering with individuals' rights to privacy and liberty.

Article I, section 9, applies to traffic stops. *State v. Rodgers/Kirkeby*, 347 Or 610, 618, 227 P3d 695 (2010). To be constitutional, a stop for the purpose of investigating a traffic violation must be based on probable cause that the person to be stopped has committed the violation. ORS 810.410(2), (3); *State v. Matthews*, 320 Or 398, 402, 884 P2d 1224 (1994). The probable cause requirement serves to protect the rights of all individuals to travel without unjustified interference by government officers; it helps to ensure that government officers exercise their authority only for proper purposes.

When a defendant moves to suppress evidence obtained as a result of a warrantless seizure on the ground that the seizure violated Article I, section 9, the state bears the burden of proving that the seizure was constitutional. *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983). In this case, the state did not establish that Hulke had probable cause to stop defendant. Therefore, as the trial court held, the stop violated defendant's Article I, section 9, rights. As a result, the question in this case is whether defendant's statements obtained during and after the unlawful stop were subject to exclusion under Article I, section 9.

In *Davis,* the Oregon Supreme Court explained the history and underlying principles of the exclusionary rule of Article I, section 9. 295 Or at 231-37. The court reviewed early cases in which other courts had excluded evidence that had been obtained in violation of protections against unreasonable searches and seizures, and it cited with approval cases in which courts had held that the exclusion of evidence obtained in violation of the protections was necessary to give effect to the protections because, without it, the protections would have no force. *Id.* at 231-34. The court emphasized that, although the exclusionary rule can prevent the government from using evidence, it applies only to evidence that the government would not have if its officers had complied with the law. *Id.* at 237. The court also explained that the cost of exclusion was offset by the benefit of enforcement of the constitutional limits on government authority, quoting *Weeks v. United States,* 232 US 383, 393, 34 S Ct 341, 58 L Ed 652 (1914), for the proposition that, if evidence obtained in violation of a person's Fourth Amendment rights can be admitted against the person in a criminal trial, "'the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution.'" *Davis,* 295 Or at 232.

The court then reviewed its own cases and concluded that the underlying premise of the exclusionary rule of Article I, section 9, is "to bar the government's use of its own invasions of the defendant's rights, as stated in *Weeks* and its predecessors." *Davis,* 295 Or at 233 n 5. The court explained:

> "In summary, although not without some diversity of expression, the court since *State v. Laundy,* [103 Or 443, 204 P 958, *reh'g den,* 103 Or 443 (1922)] has held to a principled view of the effect of an unlawful seizure of evidence. It has maintained the principle that those rules of law designed to protect citizens against unauthorized or illegal searches or seizures of their persons, property, or private effects are to be given effect by denying the state the use of evidence secured in violation of those rules against the persons whose rights were violated, or, in effect, by restoring the parties to their position as if the state's officers had remained within the limits of their authority."

*Davis*, 295 Or at 237. Thus, evidence that the government secures in violation of a person's Article I, section 9, rights is inadmissible against that person; it must be suppressed in order to vindicate the person's constitutional rights. *Id.* As the court later stated in *State v. Davis*, 313 Or 246, 253, 834 P2d 1008 (1992), "[i]f that constitutional right to be 'secure' against impermissible government conduct is to be effective, it must mean that the government cannot obtain a criminal conviction through the use of evidence obtained in violation of a defendant's rights under that provision." Thus, "[i]f the government seeks to rely on evidence in an Oregon criminal prosecution, that evidence must have been obtained in a manner that comports with the protections given to the individual by Article I, section 9." *Id.* at 254; *see Hall*, 339 Or at 24 ("The right to be free from unreasonable searches and seizures under Article I, section 9, also encompasses the right to be free from the use of evidence obtained in violation of that provision.").

The applicability of the Oregon exclusionary rule of Article I, section 9, is to be determined in light of the reasons for the rule. *Hall*, 339 Or at 23; *State ex rel Juv. Dept. v. Rogers*, 314 Or 114, 118-19, 836 P2d 127 (1992). Because the purpose of the rule is to protect individuals' rights, the rule requires the suppression of evidence to restore individuals to the positions that they would have held if "the government's officers had stayed within the law." *Davis*, 295 Or at 234.

B. *The* Hall *Test for Exclusion*

Resolution of this case turns on the application of the test prescribed in *Hall* for the exclusion of evidence under Article I, section 9. Therefore, it is necessary to examine *Hall* in some detail. In *Hall*, a police officer stopped the defendant, a pedestrian, without reasonable suspicion, thereby violating the defendant's rights under Article I, section 9. 339 Or at 19. The officer did so by asking for the defendant's identification and running a warrant check. *Id.* While the check was pending, the officer asked the defendant if he was carrying any weapons or drugs and if he would consent to a search. *Id.* at 10. The defendant consented, and the officer found a vial containing methamphetamine residue in the defendant's jacket pocket. *Id.* at 11.

The defendant filed a motion to suppress evidence of the vial and its contents, asserting that the illegal stop tainted his consent and the results of the consent search. The trial court denied the motion, and the Supreme Court reversed the trial court, holding that the evidence was tainted by the illegal stop. *Id.* at 36-37. In its opinion, the court explained that there are "two related, but distinct, ways that a violation of a defendant's rights under Article I, section 9, may affect the validity of a defendant's subsequent consent to a search." *Id.* at 20. First, a violation "may negate a defendant's consent to a search upon the ground that that police conduct rendered the defendant's consent involuntary." *Id.* Second, "Article I, section 9, may require exclusion of evidence from an otherwise valid consent search upon the ground that the defendant's consent derived from a preceding violation of the defendant's rights under that state constitutional provision." *Id.* at 21.

In *Hall*, the defendant did not claim that his consent was involuntary; the issue was whether the defendant's consent was tainted by the illegal stop. That, the court explained, was dependent on the nature of the causal connection between the illegal stop and the defendant's consent. *Id.* at 28. According to the court, the test to determine whether consent is tainted for the purposes of Article I, section 9, is similar to the "fruit of the poisonous tree" test articulated by the United States Supreme Court in *Wong Sun v. United States*, 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963), in which, in the context of a challenge to the admission of statements made during an illegal arrest, the Court stated:

> "'We need not hold that all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. *Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.*'"

339 Or at 21 n 12 (quoting *Wong Sun*, 371 US at 487-88 (internal quotation marks omitted)) (emphasis added). Thus, under *Wong Sun*, evidence that is causally connected

to illegal police action is inadmissible unless it has been, or would have been, obtained "by means sufficiently distinguishable" from the illegal action "to be purged of the primary taint." 317 US at 488. In other words, such evidence is inadmissible unless "the connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint.'" *Id.* at 487 (quoting *Nardone v. United States,* 308 US 338, 341, 60 S Ct 266, 84 L Ed 307 (1939)).

In a manner consistent with the phrasing of the "fruit of the poisonous tree" test in *Wong Sun,* the *Hall* court stated that the question before it was "whether Article I, section 9, require[d] exclusion of the state's evidence because [the] defendant's consent derived from—or, stated differently, was obtained by 'exploitation' of—the unlawful stop." *Hall,* 339 Or at 22.[6] The court then prescribed how courts are to determine whether a defendant's consent "derived from" prior unlawful police conduct. The court explained that, in order for evidence to be excluded on the ground that it resulted from a violation of a defendant's Article I, section 9, rights, there must be a causal connection between the violation and the discovery of the evidence, and, if there is a causal connection, exclusion is required unless the government can establish "that the evidence did not derive from the preceding illegality." *Id.* at 25. To do so, the government

"must prove that either (1) the police inevitably would have obtained the disputed evidence through lawful procedures even without the violation of the defendant's rights under Article I, section 9; (2) the police obtained the disputed evidence independently of the violation of the defendant's rights under Article I, section 9; or (3) the preceding violation of the defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence[.]"

---

[6] Thus, under both *Wong Sun* and *Hall,* evidence is the product of "exploitation" of unlawful police conduct if it has been obtained as a result of—or derived from—that conduct, as opposed to a "means sufficiently distinguishable" from that conduct. *Wong Sun,* 371 US at 488; *Hall,* 339 Or at 25; *see also Florida v. Royer,* 460 US 491, 507-08, 103 S Ct 1319, 75 L Ed 2d 229 (1983) (consent obtained during the defendant's illegal detention was tainted).

*Id.* (internal citations omitted). In each of those three circumstances, "the admission of the challenged evidence does not offend Article I, section 9, because the defendant has not been disadvantaged as a result of the unlawful police conduct, or stated differently, because the defendant is not placed in a worse position than if the governmental officers had acted within the bounds of the law." *Id.*

In *Hall*, the issue was whether the state had established that the causal connection between the violation of the defendant's rights and the discovery of the disputed evidence was so tenuous that the violation could not "be viewed properly as the source of [the] evidence." *Id.* According to the *Hall* court, determining whether the state has established that the violation is only tenuously related to the discovery of the evidence "requires a fact-specific inquiry into the totality of the circumstances." *Id.* at 35. Several considerations are relevant to that determination, including "(1) the temporal proximity between the unlawful police conduct and the [discovery of the evidence], (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent—that mitigated the effect of the unlawful police conduct." *Id.*

To summarize, *Hall* establishes that, if there is a causal connection between unlawful police conduct and a defendant's consent to a search, evidence obtained as a result of the consent is inadmissible unless the state proves that the discovery of the evidence "was independent of, or only tenuously related to, the unlawful police conduct." *Id.* And, considerations relevant to whether a defendant's consent is only tenuously related to the unlawful police conduct include the temporal proximity between the conduct and the consent and whether there are any intervening circumstances or other circumstances that mitigate the effect of the unlawful police conduct. *Id.*

Applying its test to the facts of the case before it, in which the officer illegally stopped the defendant by asking for his identification and running a warrant check, the *Hall* court concluded that the officer's illegal stop vitiated

the defendant's consent to the search. *Id.* at 36. The court explained:

> "Given the close temporal proximity between the illegal detention and [the] defendant's consent, and the absence of any intervening circumstances or other circumstances mitigating the effect of that unlawful police conduct, we cannot say that the state has proved that the defendant's decision to consent, even if voluntary, was not the product of the preceding violation of [the] defendant's rights under Article I, section 9."

*Id.* Therefore, the court further concluded, evidence resulting from the defendant's consent was inadmissible. *Id.*

Importantly, the *Hall* court distinguished the facts of the case before it from the facts in two other cases: *State v. Kennedy*, 290 Or 493, 624 P2d 99 (1981), and *State v. Rodriguez*, 317 Or 27, 854 P2d 399 (1993). In *Kennedy*, when police officers told the defendant that they had information that he was carrying narcotics, the defendant "denied that he was carrying narcotics and said, 'Would you like to search my luggage?'" 290 Or at 496. The officers found cocaine as a result of the search, and the defendant moved to suppress that evidence on the ground that the officers had illegally stopped him before he invited the officers to search his luggage. In *Rodriguez*, a police officer asked the defendant, who had already been advised of his *Miranda* rights, "[D]o you have any drugs or guns in the house?" and he replied, "No, go ahead and look." 317 Or at 30. The police found a gun in the house, and the defendant moved to suppress that evidence on the ground that the police had illegally arrested him before he offered to allow the officers to search. In each case, the Supreme Court concluded that, even assuming that the officers had engaged in unlawful conduct, the evidence discovered as a result of the defendant's consent was admissible. In *Hall*, the court explained that its conclusions in *Kennedy* and *Rodriguez*

> "must be understood in light of the specific facts of each of those cases—particularly, the facts that those defendants both had volunteered to allow a search without any police prompting and, in *Rodriguez*, that the police had provided the defendant with *Miranda* warnings before questioning him about drugs or weapons."

339 Or at 34. The court further explained that, "[i]n the absence of such intervening circumstances—or other circumstances mitigating the effect of the unlawful police conduct—this court has required suppression under facts similar to those at issue in *Kennedy* and *Rodriguez*," that is, when officers obtain consent during an unlawful (or unlawfully extended) stop. *Id.* As examples, the court cited *Toevs*, 327 Or 525, and *State v. Dominguez-Martinez*, 321 Or 206, 895 P2d 306 (1995). In each of those cases, an officer lawfully stopped the defendant for a traffic violation, completed the investigation of the violation, told the defendant that he was free to go, but then asked the defendant if he would consent to a search. And, in each case, the Supreme Court concluded that the officer's conduct after telling the defendant that he was free to go constituted an unlawful extension of the traffic stop and that the defendant's consent and the evidence resulting from it were tainted and had to be suppressed.[7] *Toevs*, 327 Or at 537-38; *Dominguez-Martinez*, 321 Or at 214.

Subsequent cases involving traffic stops have followed *Hall*. In *State v. Thompkin*, 341 Or 368, 371, 143 P3d 530 (2006), an officer asked the defendant, who was a passenger in a car that had been lawfully stopped for a traffic violation, for her identification, which the officer used to run a records check. Meanwhile, a second officer questioned the defendant about drugs. The questioning prompted the defendant to surrender a pipe used for smoking crack cocaine, and a subsequent search led to the discovery of a small amount of cocaine. The Supreme Court held that the officers had illegally stopped the defendant and that the resulting evidence was inadmissible. *Id.* at 381. The court explained that the reasoning of *Dominguez-Martinez*, *Toevs*, and *Hall* was "equally applicable to this case, where [the] defendant voluntarily surrendered incriminating evidence in response to the officer's questioning during an impermissible seizure," and where there were no "intervening circumstances or other circumstances mitigating the effect of the unlawful police conduct." *Thompkin*, 341 Or at 381.

---

[7] *Toevs* and *Dominguez-Martinez* involved violations of ORS 810.410, which governs police authority to conduct traffic stops, but, as the Supreme Court noted in *Hall*, the reasoning of those opinions is applicable in cases involving violations of Article I, section 9. *Hall*, 339 Or at 33 nn 19-20.

Likewise, in *Rodgers/Kirkeby,* 347 Or at 630, which involved two cases that were consolidated for review, the Supreme Court held that the officer in each case illegally extended an otherwise lawful traffic stop when, rather than proceeding to either issue a citation or release the defendant, the officer questioned the defendant about matters unrelated to the reason for the stop and requested consent to search, which the defendant gave and which led to the discovery of contraband. Regarding the effect of the illegal extension on one of the defendants, the court observed that the defendant had "no way of knowing that [the officer's] questions and request to search the car were not part of the traffic investigation and that his cooperation in [the officer's] investigation was not required to continue." *Id.* at 626. The court concluded that "as in *Hall,* given the temporal proximity between the illegal detention and each defendant's consent, and in the absence of any other intervening circumstances, or other circumstances mitigating the effect of the unlawful seizures of each defendant, * * * each defendant's consent, even if voluntary, was the product * * * of the unlawful seizure." *Id.* at 630.

*Hall,* its predecessors, and its progeny establish that, when an officer illegally stops a person and makes an inquiry, the person's response to that inquiry is the product of the illegal stop and evidence obtained as a result of the inquiry is inadmissible, unless the state proves that the response was "independent of, or only tenuously related to, the unlawful police conduct." *Hall,* 339 Or at 35. They also establish that, in the absence of intervening circumstances or other circumstances that mitigate the effect of the illegal stop, a person's response to an officer's inquiry during an illegal stop is not attenuated from the illegality; it is the tainted fruit of the illegality.

Of particular relevance here, both we and the Supreme Court held, well before *Hall,* that, when an officer illegally stopped a driver and requested the driver's identification, the driver's response to that request was tainted by the illegal stop, as was the evidence obtained as a result of the driver's response. *State v. Starr,* 91 Or App 267, 754 P2d 618 (1988), and *State v. Farley,* 308 Or 91, 775 P2d 835 (1989), are illustrative.

In *Starr*, an officer illegally stopped the defendant, who had been sleeping in his car on the side of the road, by requesting and retaining his driver's license. After the officer returned the license, the defendant drove away, and the officer ran a records check and learned that the defendant's driving privileges were suspended. The officer pursued the defendant and arrested him for driving while suspended. The trial court suppressed the evidence resulting from the illegal stop, including the defendant's identity, and we affirmed. 91 Or App at 269-70. We specifically rejected the state's argument that the officer was "entitled to know [the] defendant's name from the first encounter," stating that "[u]nder the circumstances, [the officer] did not have authority to compel [the] defendant to do anything, including giving his name." *Id.* at 270. Accordingly, we concluded that "[the] defendant's identity was obtained as a result of the unlawful stop." *Id.*

In *Farley*, an officer stopped the defendant for driving a vehicle that did not have a license plate. 308 Or at 93. But, when the officer approached the defendant's car, he saw a temporary registration sticker in the window. At that point, the officer's reason for the stop evaporated. *Id.* Nevertheless, the officer proceeded to ask the defendant for his driver's license and proof of registration. The defendant's responses to those requests led to the discovery of evidence that the defendant's license was suspended and he was driving uninsured. The Supreme Court held that, once the reason for the stop evaporated, the officer did not have authority to ask the defendant for his license and registration, and the court affirmed the trial court's order suppressing the evidence resulting from those requests. *Id.* at 94; *see also State v. Bentz*, 211 Or App 129, 134, 158 P3d 1081 (2007) (holding that officer's request for defendant's name during an illegal entry constituted exploitation of the illegal entry under *Hall*).

As *Starr* and *Farley* show, an illegal stop taints evidence obtained in response to police inquiries made during the illegal stop, absent intervening or mitigating circumstances. A defendant is entitled to suppression of such evidence, and, contrary to the dissent's suggestion, 264 Or App at 538-39 (Hadlock, J., dissenting), the defendant is

not required to prove that that the officer was conducting a criminal investigation or that there were coercive circumstances above and beyond the illegal stop. *Id.* (describing the *Hall* test for exclusion).

Essentially, the *Hall* test creates a presumption that, if the discovery of evidence is causally connected to unlawful police conduct, the evidence is tainted and, therefore, inadmissible. The state can rebut the presumption by showing that (1) the evidence would have been inevitably discovered, (2) the evidence had an independent source, or (3) the causal connection between the unlawful conduct and the discovery of the evidence was tenuous. 339 Or at 25. The presumption is proper; it reflects the reality—both legal and practical—that unlawful police conduct puts an individual at a disadvantage that can affect the person's decision whether to, for example, consent to a search, surrender property, or make a statement.

A stop can affect a person's decision whether to respond to an officer's request for information in at least two ways. First, it restricts the person's legal options. Unlike a person who has not been stopped, a person who has been stopped is not free to walk away from an officer seeking information; the person's legal options for responding to an inquiry by the officer have been restricted. That is particularly true for traffic stops. As the Supreme Court explained in *Rodgers/Kirkeby*:

> "[I]n contrast to a person on the street, who may unilaterally end an officer-citizen encounter at any time, the reality is that a motorist stopped for a traffic infraction is legally obligated to stop at an officer's direction, *see* ORS 811.535 (failing to obey a police officer) and ORS 811.540 (fleeing or attempting to elude a police officer), and to interact with the officer, *see* ORS 807.570 (failure to carry or present license) and ORS 807.620 (giving false information to a police officer), and therefore is not free unilaterally to end the encounter * * *."

347 Or at 622-23. If, for example, a driver does not provide identification to an officer, the officer may detain or arrest the person in order to investigate and verify the driver's

identity. As a result, when an officer subjects a person to a traffic stop, the officer has gained the authority to impose negative consequences—further detention or arrest—if the person refuses to respond to a request for identification.

Second, a stop can affect a person's decision whether to respond to an officer's request for information because it brings additional considerations to bear on the person's decision—considerations such as what effect noncompliance with the officer's request could have on the person's release. In other words, a stop changes a person's decisional calculus by introducing additional factors that weigh in favor of compliance.[8]

When a person has been *illegally* stopped, the person's options have been *illegally* restricted, and additional factors that weigh in favor of compliance have been *illegally* introduced. Thus, an illegal stop subjects the person to "the pressure of police action that [is] available to police only by the prior unauthorized conduct." *State v. Williamson*, 307 Or 621, 626, 772 P2d 404 (1989). It puts the person "in a worse position than if the governmental officers had acted within the bounds of the law." *Hall*, 339 Or at 25. Accordingly, it is appropriate that, under the *Hall* test, if there is a causal connection between unlawful police conduct and the discovery of evidence, the evidence cannot be admitted unless the state proves that its discovery was independent of, or only tenuously connected to, the illegal stop.

C. *Application of the* Hall *Test*

As in *Hall*, the issue in this case is whether the causal connection between the illegal stop and the challenged evidence is attenuated. We conclude that defendant's statements to Hulke during the unlawful traffic stop are not attenuated from the stop, but that his statements one month later are.

---

[8] In addition, if the stop is illegal, it signals to the stopped person that his or her rights will not be respected. To illustrate, if an officer illegally seizes an item of property from a person and then asks for consent to search it, the illegal seizure conveys a disregard of the person's rights, which will weigh in favor of compliance with the officer's request for consent. The same is true if, instead of seizing property, an officer seizes a person.

With respect to the earlier statements, there was no temporal break between the stop and the statements; the stop was ongoing when the statements were made. There were no mitigating circumstances: Hulke did not inform defendant that he did not need to answer his questions, and the circumstances—a traffic stop—would have caused defendant to reasonably believe that he was required to provide the officer with identification. Nor were there any intervening circumstances: Nothing occurred that would have alerted defendant that he was free to leave or to refuse to provide information. And, the statements were not spontaneous. They are akin to the defendants' self-identifications in *Starr* and *Farley*, the defendants' consents in *Toevs, Dominguez-Martinez, Hall*, and *Rodgers/Kirkeby*, and the defendant's surrender of evidence in *Thompkin*.

The opposite is true for the statements that defendant made one month later. Defendant was not stopped when he made the oral statements to Shull or when he completed the written statement at his local police department; indeed, a significant amount of time had passed since the illegal stop. Moreover, defendant initiated the contact with government authorities by telling the district attorney's office that he had given a false name.

The dissent concludes that defendant's statements during the illegal stop are not tainted. In reaching its conclusion, the dissent acknowledges that *Hall* governs its analysis, but does not abide by *Hall*. The dissent suggests that Hulke did not "exploit" the illegal stop because he "did not trade on or otherwise take advantage" of the stop to ask defendant his name. 264 Or App at 536-37 (Hadlock, J., dissenting). The dissent's focus on whether Hulke "trade[d] on or otherwise [took] advantage of" the illegal stop is based on *Rodriguez*. 264 Or App at 537 (Hadlock, J., dissenting). To the extent that the dissent relies on *Rodriguez* to suggest a different test than *Hall* for whether evidence is the "fruit of the poisonous tree," we must apply *Hall*. Moreover, concluding, as the dissent does, that evidence obtained as a result of unlawful police conduct is tainted only if an officer engaged in coercive conduct in addition to the illegal stop, is inconsistent with *Starr* and *Farley*, where the evidence that

was suppressed had been obtained as a result of requests for identification.

The dissent accepts the state's argument based on *State v. Crandall*, 340 Or 645, 136 P3d 30 (2006). In *Crandall*, a police officer directed the defendant to "stop" and "come here." *Id.* at 647. The "[d]efendant obeyed that direction but, before he reached the officer, put a clear plastic 'baggie' containing a controlled substance underneath one of the cars in the apartment parking lot." *Id.* On review, the Supreme Court assumed that the officer had illegally stopped the defendant, but concluded that the illegality did not taint the subsequently discovered evidence. *Id.* at 652-53. The court held that the "defendant's unilateral, voluntary decision to put the baggie underneath the car sufficiently attenuated the discovery of that evidence from the prior illegality, in the same way that the defendants' acts in *Kennedy* and *Rodriguez* did." *Id.* at 652.

Relying on *Crandall*, the dissent contends that "defendant's unilateral, voluntary decision to lie about his identity attenuated the discovery of the evidence * * * from the prior illegality." 264 Or App at 535 (Hadlock, J., dissenting). According to the dissent, "defendant's unilateral choice to give a false name was an intervening circumstance that attenuated the discovery of that false statement from the prior illegality[.]" *Id.* at 536.

That is incorrect for several reasons. First, defendant's decision was not "unilateral." As mentioned, in *Crandall*, the Supreme Court held that the defendant's act of putting the baggie under the car was similar to the defendants' consents in *Kennedy* and *Rodriguez*, which were volunteered, and different from the defendant's consent in *Hall*, which was in response to a question. This case is akin to, and controlled by, *Hall*. Like *Hall*, and unlike *Kennedy* and *Rodriguez*, it involves a direct response to an officer's request, not a volunteered or unilateral action. *See also State v. Campbell*, 207 Or App 585, 590, 142 P3d 517 (2006) (distinguishing *Kennedy* and *Rodriguez* because defendant did not volunteer to be searched but consented only after deputy asked for permission to conduct a patdown search).

Second, defendant's false statement was not an "intervening circumstance" between the illegal stop and the discovery of the evidence. It *was* the evidence.

Third, and finally, it is irrelevant that defendant's statement was false. Whether a statement is the product of prior unlawful conduct does not depend on whether the statement is true or false. If, as the dissent suggests, a decision to lie in response to a question could be said to be a "unilateral, voluntary decision," a decision to tell the truth could also be said to be a "unilateral, voluntary decision," as could a decision to consent to a search. The dissent's reasoning would lead to the conclusion that, if an illegally stopped person provided his name upon request, and, as a result of a records check, was charged with driving while suspended, then the evidence obtained as a result of the stop would be admissible. That, however, is contrary to controlling law. *Starr*, 91 Or App at 270; *Farley*, 308 Or at 94. Likewise, the dissent's reasoning would lead to the conclusion that, if an illegally stopped person was asked to consent to a search and did consent, the results of the search would be admissible. That, too, is contrary to controlling law. *Hall*, 339 Or at 36.

Ultimately, the dissent's conclusion rests on the fact that defendant committed a new crime, giving false information to a police officer. The dissent appears to have accepted the state's argument based on *Gaffney*, 36 Or App at 105, in which we recognized an exception to the exclusionary rule for evidence of new crimes that threaten officer safety. The *Gaffney* exception to the exclusionary rule is a limited one; it applies to "evidence of independent crimes directed at officers who illegally stop, frisk, arrest or search." 36 Or App at 108. Accordingly, we have applied it only in cases in which the challenged evidence involved a new crime that threatened officer safety. *See e.g.*, *State v. Rodriguez*, 37 Or App 355, 357, 587 P2d 487 (1978), *rev den*, 285 Or 319 (1979) (evidence that defendant hit officer in the head was admissible even if officer had illegally stopped defendant); *State v. Burger*, 55 Or App 712, 715-16, 639 P2d 706 (1982) (evidence that defendant kicked officers after being arrested was admissible even if the arrest was unlawful).

And, in *State v. Williams*, 161 Or App 111, 119-20, 984 P2d 312 (1999), we expressly declined to extend the exception to evidence of a crime—supplying contraband, for bringing marijuana into jail—that the defendant allegedly committed after being illegally arrested. We explained that the *Gaffney* line of cases was "inapposite" because "[t]he crucial fact in those cases was that the new crime was directed at the arresting officers, thereby threatening their safety." *Id.* at 119. "The rationale underlying our denial of suppression in those cases," was absent in *Williams* because "[t]he presence of the concealed marijuana did not threaten the officer's safety in any way." *Id.* at 120. Therefore, we concluded, evidence of the marijuana was tainted and had to be suppressed in order to "'restor[e] the parties to their position as if the state's officers had remained within the limits of their authority.'" *Id.* (quoting *Davis*, 295 Or at 237).

Just as the evidence of the alleged supplying contraband had to be suppressed in *Williams* in order to restore the parties to the positions that they would have occupied had the state's officers not violated the defendant's Article I, section 9, rights, the challenged evidence in this case must be suppressed. To admit the evidence under the *Gaffney* exception would be inconsistent with the limited purpose of the exception that we clearly articulated in *Williams*.[9]

Because defendant's statements during the illegal stop were not attenuated from the stop and are not admissible under the *Gaffney* exception to the exclusionary rule, we conclude that the trial court erred in denying defendant's motion to suppress those statements. Admission of those statements was not harmless because, as defendant argues and the state does not dispute, the state could not have secured a conviction based on the later statements alone. *See* ORS 126.425(1) ("A confession [is not] sufficient to warrant the conviction without some other proof that the crime has been committed[.]").

---

[9] The state does not argue that *Williams* is plainly wrong, nor does it offer any reason why the balance struck in that case between the protection of the defendant's constitutional rights and the state's interest in prosecuting crimes should be any different in this case, which involves a nonviolent misdemeanor.

## IV. CONCLUSION

In sum, we conclude that the trial court erred in failing to suppress the statements that defendant made during the illegal stop and that the error was not harmless. Therefore, we reverse and remand.

Reversed and remanded.

**HADLOCK, J.,** dissenting.

Defendant gave a false name to a police officer who had conducted a traffic stop. As the state concedes, that stop must be deemed unlawful because the officer could not recall, at the time of the hearing on defendant's motion to suppress, why he had stopped defendant, and the officer apparently had not memorialized the reason for the stop, in a citation or otherwise. The majority concludes that the trial court erred in denying defendant's motion to suppress the statements that he made during that unlawful traffic stop because those statements "were not attenuated from the stop and are not admissible under the *Gaffney* exception to the exclusionary rule." *State v. Suppah*, 264 Or App, 510, 531, 334 P3d 463 (2014). With respect, I dissent.

I briefly recap the undisputed facts. In July 2010, Officer Hulke stopped defendant for a traffic violation, but he was not able to recall, at a later suppression hearing, what that violation was. During the stop, Hulke asked defendant for his name and date of birth. Instead of answering truthfully, defendant gave him the name and birth date of a friend, Pennington. Although defendant was unaware of it, Pennington's license was suspended at the time. Hulke issued a citation to defendant, using Pennington's name, for driving with a suspended license and driving uninsured. Approximately one month later, defendant contacted the district attorney's office, stating that he had given "a wrong name" and asserting that he did not want Pennington to get in trouble because of his actions. Deputy Sheriff Shull followed up with defendant and asked him to submit a written statement through his local police department. Defendant submitted a statement in which he explained that he had been pulled over by Hulke on July 14. He later was charged

with giving false information to a police officer, ORS 807.620 and driving while suspended, ORS 811.182.[1]

Before trial, defendant moved to suppress all information and evidence that had been obtained from the stop, arguing that the search and seizure violated his rights under various constitutional provisions, including Article I, section 9, of the Oregon Constitution.[2] Based on Hulke's inability to recall the reason that he had stopped defendant, the trial court ruled that the stop had been illegal. Nonetheless, the court denied defendant's suppression motion, stating,

> "I'm going to find the stop was illegal, but the conduct of the Defendant was independent in his own decision to notify the police that he gave a wrong name. And to keep his friend out of trouble as well as having the car towed in that I'm also going to find that there was a substantial attenuation of the time frame in which this took place."

Defendant waived his right to a jury and was tried to the court, which found him guilty of giving false information to a police officer.

On appeal, defendant argues that the trial court should have suppressed both his statements from the initial traffic stop and the statements that he made to police one month later. He contends that suppression was required under Article I, section 9, because the evidence was derived from an unlawful stop and not "sufficiently attenuated to remove the taint of the unlawful stop."

For the reasons stated by the majority, I agree that the trial court correctly denied defendant's motion to suppress the statements that he made one month after the traffic stop. *See Suppah*, 264 Or App at 527-28.

However, I disagree with the majority's conclusion that the trial court erred by denying defendant's motion

---

[1] Defendant was acquitted of driving while suspended.

[2] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

to suppress the statements that he made during the traffic stop. I begin my analysis with *State v. Hall*, 339 Or 7, 25, 115 P3d 908 (2005), which explains the circumstances under which a trial court should suppress evidence that police officers obtained as a result of their own unlawful conduct. Under *Hall*, a defendant seeking to suppress evidence must first establish "a minimal factual nexus—that is, at minimum, the existence of a 'but for' relationship—between the evidence sought to be suppressed and prior unlawful police conduct." *Id.* at 25. However, the existence of that "but for" connection is not enough, standing alone, to warrant suppression. *See State v. Rodriguez*, 317 Or 27, 40, 854 P2d 399 (1993) ("[t]he fact that, 'but for' the unlawful conduct the police would not have been in a position to seek (for example) a person's consent does not, in and of itself, render any evidence uncovered during the ensuing consent search inadmissible"). Rather, once that minimum factual nexus is established, the state has the burden of showing that the evidence was not obtained through "exploitation" of the unlawful police conduct:

> "[T]he state nevertheless may establish that the disputed evidence is admissible under Article I, section 9, by proving that the evidence did not derive from the preceding illegality. To make that showing, the state must prove that either (1) the police inevitably would have obtained the disputed evidence through lawful procedures even without the violation of the defendant's rights under Article I, section 9; (2) the police obtained the disputed evidence independently of the violation of the defendant's rights under Article I, section 9; or (3) the preceding violation of the defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence."

*Hall*, 339 Or at 25 (internal citations omitted); *see State v. Ashbaugh*, 349 Or 297, 244 P3d 360 (2010) (the "exploitation" analysis asks "whether the consent search in some sense *derived* from the prior unlawful police stop" (emphasis in original)). In determining whether evidence derived from unlawful police conduct—or, conversely, "was independent of, or only tenuously related to" it—we consider the specific facts at issue, including the temporal proximity between the

unlawful police conduct and the discovery of the evidence, and the existence of any intervening or mitigating circumstances. *Hall*, 339 Or at 35.

As noted, the state does not challenge the trial court's determination that Hulke's stop of defendant was unlawful. Nor does the state contend that no "but for" connection exists between the stop and the statements that defendant made during that stop—specifically, defendant's false declaration that he was Pennington. Rather, the state argues only that Hulke did not obtain that statement by exploiting the illegal stop. In that regard, the state argues, it was defendant's own, independent desire to evade citation that prompted him to lie. The state asserts that, "simply because an individual is unlawfully detained under Article I, section 9, it does not follow that the evidence of defendant's new, independent crime—providing false information to a police officer—must be suppressed."

In support of that contention, the state cites *State v. Crandall*, 340 Or 645, 136 P3d 30 (2006). In that case, a police officer unlawfully stopped the defendant without reasonable suspicion of criminal activity, by telling him to "stop" and "come here" as he left an apartment. *Crandall*, 340 Or at 647. The "[d]efendant obeyed that direction, but before he reached the officer, he put a clear plastic 'baggie' containing a controlled substance underneath one of the cars in the apartment parking lot." *Id.* After noting that the officer's direction to "stop" and "come here" was the "but for" cause of the defendant's decision to put the baggie underneath the car, the Supreme Court concluded that the "defendant's unilateral, voluntary decision to put the baggie underneath the car sufficiently attenuated the discovery of that evidence from the prior illegality," such that "'the unlawful police conduct cannot be viewed properly as the source of that evidence.'" *Id.* at 652-53 (quoting *Hall*, 339 Or at 25).

Here, the state argues, defendant's unilateral, voluntary decision to lie about his identity attenuated the discovery of the evidence (his false statement) from the prior unlawful police conduct, in much the same way that the defendant's actions in *Crandall* did. In my view, the state's reliance on *Crandall* is apt. Although Hulke's request for

identification was the "but for" cause of defendant's decision to give him Pennington's name, defendant made a unilateral, voluntary decision to lie. Thus, just as the defendant in *Crandall* chose to hide evidence of drugs in an attempt to avoid criminal liability, the defendant in this case chose to hide evidence of his identity in an attempt to avoid the consequences of giving his own name. In each case, the officer's unlawful action was the "but for" cause of the defendant's choice, but that voluntary choice (and the officer's discovery of evidence that flowed from that choice) cannot be said to have derived from the officer's action. And here (unlike in *Crandall*), defendant's choice involved committing a new crime (giving false identification to a police officer) that had not yet existed when the officer asked him for identification, further weakening any causal link between the officer's inquiry and the officer's discovery of evidence (the false name). Given the totality of the circumstances, I would conclude that defendant's unilateral choice to give a false name was an intervening circumstance that attenuated the discovery of that false statement from the prior illegality, such that the unlawful stop "cannot be viewed properly as the source of that evidence." *Hall*, 339 Or at 25.[3]

Put differently, Hulke did not "exploit" his unlawful stop of defendant in any way that resulted in defendant giving the false name. True, Hulke would not have asked defendant for his name had he not conducted the traffic stop, and defendant presumably would not have provided any identifying information (accurate or not) had Hulke not asked that question. But that chain of events establishes nothing more than the sort of "but for" causation that the Supreme Court has held does not constitute exploitation. Take the circumstances at issue in *Rodriguez*, a case that presented the question whether the defendant's consent to search his

---

[3] In *State v. Bentz*, 211 Or App 129, 134, 158 P3d 1081 (2007), we held that a police officer's act of "asking a person's name constitutes exploitation if the question causes the person to give information that leads the police to evidence." *Bentz* does not control here because Hulke's request for defendant's name did not cause defendant to give information that led Hulke to discover evidence that already existed. Rather, by giving a false name in response, defendant voluntarily and unilaterally committed a *new* crime and created *new* evidence that otherwise would not have existed. Consequently, Hulke's discovery of that evidence was sufficiently attenuated from the illegality so as not to warrant suppression.

apartment was obtained through exploitation of a purportedly unlawful arrest. 317 Or at 38. The officer making that arrest had gone to the defendant's apartment, entered the apartment when the defendant "stepped back," which the officer took as an indication to step in, read *Miranda* warnings to the defendant, and then asked, "Do you have any drugs or guns in the house?" *Id.* at 30. Although the defendant then said, "No, go ahead and look," the officer sought clarification, asking, " 'Can we search?' You know, 'Want to consent to search,' and so forth." *Id.* At that point, the defendant said, "Yes, go ahead." *Id.*

The Supreme Court held that the *Rodriguez* defendant's consent was not obtained through exploitation of the purportedly unlawful arrest, which had brought the officer to the defendant's apartment, because the officer "did not trade on or otherwise take advantage of the arrest to obtain [the] defendant's consent to the search." *Id.* at 41. "The mere fact that, but for the arrest, the agent would not have been standing in the doorway of [the] defendant's apartment, in a position to ask [the] defendant about drugs and guns" did not establish that the officer had exploited the arrest to obtain the defendant's consent. *Id.* Similarly, the mere fact that the traffic stop put Hulke in the position to ask defendant's name does not, itself, amount to "exploitation" of the illegality associated with that stop.

The majority's disagreement with my analysis is based primarily on *Hall*, in which the Supreme Court held that a defendant's consent to search was obtained through exploitation of an unlawful stop. 339 Or at 36. But *Hall* does not stand for the proposition that *any* request for information—or request for consent to search—made during an unlawful stop necessarily constitutes exploitation. Rather, the *Hall* court made a fact-specific determination of whether "the unlawful police conduct, even if not overcoming the defendant's free will, significantly affected the defendant's decision to consent." *Id.* at 35. Given the totality of the circumstances in that case, including that the officer requested consent to search immediately after he had asked the defendant about whether he was carrying weapons or illegal drugs, and while he was awaiting the results of a warrant check, the court held that the state had not proved

that the "defendant's decision to consent, even if voluntary, was not the product of the preceding violation of [the] defendant's rights under Article I, section 9." *Id.* at 36. Nothing in this record suggests that defendant's decision to give a false answer to Hulke's request for identifying information was based on similar police pressure.

The other cases on which the majority relies—like *Hall*—also involved two types of facts that are not present here. First, in each of those cases, police officers took advantage of an unlawful (or unlawfully extended) stop to conduct an investigation into possible criminal activity, like the unlawful possession of controlled substances or weapons. *See State v. Rodgers/Kirkeby*, 347 Or 610, 626-28, 227 P3d 695 (2010) (officer asked defendant Rodgers about items in car possibly related to the manufacture of controlled substances, and requested consent to search, during an unlawful extension of a traffic stop; officer requested consent to patdown and further search from defendant Kirkeby after traffic stop should have concluded); *State v. Thompkin*, 341 Or 368, 378-79, 143 P3d 530 (2006) (officers unlawfully seized the defendant, who was a passenger in a stopped car, when they requested and retained her identification to run a warrants check and questioned her about illegal activity); *State v. Toevs*, 327 Or 525, 537, 964 P2d 1007 (1998) (officer questioned the defendant about drugs during an unlawfully extended traffic stop); *State v. Dominguez-Martinez*, 321 Or 206, 208-09, 895 P2d 306 (1995) (similar). Second, *Rodgers/Kirkeby* and *Thompkin* involved coercive circumstances beyond the types of discomfort or inconvenience that may often accompany an unadorned traffic stop. *See Rodgers/Kirkeby*, 347 Or at 626-28 (discussing officers' "show of authority"); *Thompkin*, 341 Or at 378-79 (explaining circumstances that amounted to seizure of the defendant).[4] This case does not involve analogous circumstances. Hulke was not conducting the sort of criminal investigation that is aimed at revealing inculpatory evidence (like weapons, drugs, or other contraband) when he simply asked defendant for his identification in conjunction with a traffic stop.

---

[4] In *Toevs and Dominguez-Martinez*, the Supreme Court held that, under then-existent statutes that subsequently were amended, evidence obtained during an unlawfully extended stop *necessarily* had to be suppressed. 327 Or at 537-38; 321 Or at 214.

Moreover, no other potentially coercive circumstances were present—for example, before requesting defendant's identification, Hulke had not asked him about contraband or sought consent to search defendant or his vehicle.[5]

The majority also rejects my reliance on *Crandall*— and my ultimate determination that defendant's choice to lie was an intervening circumstance that attenuated discovery of the falsehood from the illegality of the stop—asserting that application of my analysis would lead to the admissibility of *all* statements that defendants made in response to police questioning during an unlawful traffic stop. *Suppah*, 264 Or App at 530. With respect, I disagree. Questions of the type identified by the majority—like a request for consent to search—often are aimed (unless they are asked for officer-safety reasons) at uncovering possible criminal activity. Thus, an officer who asks such questions during the course of an unlawful (or unlawfully extended) traffic stop, and gains inculpatory evidence as a result, frequently may be said to have *traded on* the stop—*i.e.*, exploited the unlawful stop—to conduct a criminal investigation. In such circumstances, the officer's discovery of the evidence is not attenuated from the illegality. But attenuation does exist when, as here, a police officer simply asks a driver for identification during the course of a stop and, as a result, obtains evidence of a *newly committed* crime (giving false information to a police officer) and not evidence of a crime that the defendant already had committed before the questioning ensued.

---

[5] The majority also cites *State v. Starr*, 91 Or App 267, 754 P2d 618 (1988), and *State v. Farley*, 308 Or 91, 775 P2d 835 (1989). I find those pre-*Hall* (indeed, pre-*Rodriguez*) cases unhelpful to the analysis. In *Starr*, this court stated with little explanation that a trial court properly suppressed evidence of a stopped driver's identification because the "defendant's identity was obtained as a result of the unlawful stop." 91 Or App at 270. That holding has little persistent significance, as it preceded the *Hall* distinction between a mere "but for" link between an officer's unlawful conduct and subsequently obtained evidence (which would not result in suppression) and an unattenuated exploitative link (which would result in suppression), and includes no similar analysis. And in *Farley*, the Supreme Court's analysis focused on its determination that, under ORS 810.410(3), a police officer "had no statutory authority" to ask a lawfully stopped driver for his license once the justification for the stop had ended. 308 Or at 94. The court went on to hold that the trial court had correctly granted the defendant's motion to suppress evidence that the officer obtained as a result of obtaining the defendant's license, but the court did so without engaging in any sort of exploitation analysis like the one later announced in *Rodriguez* and *Hall*.

In short, defendant voluntarily committed a new crime when he gave Hulke a false name after the unlawful traffic stop. In my view, that new crime was an intervening circumstance that attenuated the causal connection between the unlawfulness of the stop and the newly created evidence (the giving of the false name) that defendant sought to suppress. Accordingly, I would hold that the trial court did not err when it denied defendant's suppression motion. I respectfully dissent from the majority's contrary conclusion.

Haselton, C. J., and Wollheim, Ortega, and DeVore, JJ., join in this dissent.