No. 3    February 19, 2016    565

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

ROMAN LANCE SUPPAH,
*Respondent on Review.*

(CC 100016CT; CA A149412; SC S062648)

On appeal from the Court of Appeals.*

Argued and submitted May 8, 2015.

David B. Thompson, Assistant Attorney General, Salem, argued the cause and filed the brief for petitioner on review. With him on the brief was Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Joshua B. Crowther, Deputy Public Defender, Salem, argued the cause and filed the brief for respondent on review. With on the brief was Ernest G. Lannet, Chief Defender, Office of Public Defense Services.

Robert M. Atkinson, Portland, filed an *amicus curiae* brief on his own behalf.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Brewer, Baldwin, Justices, and Linder, Senior Justice.**

KISTLER, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

_____

\*   Appeal from Sherman County Circuit Court, Donald Hull, Judge. 264 Or App 510, 334 P3d 463 (2014).

\*\*   Nakamoto, J., did not participate in the consideration or decision of this case.

**KISTLER, J.**

The state charged defendant with giving false information to a deputy sheriff who had stopped him for a traffic violation. Later, at a hearing on defendant's motion to suppress, the deputy could not remember the specific traffic violation that had led him to stop defendant. The trial court found that the state's inability to establish the reason for the stop rendered it unlawful, but it denied defendant's motion to suppress the statements that defendant had made following the stop. Focusing on defendant's reasons for giving the deputy false information, the trial court found that defendant's decision to do so was independent of the illegality. The en banc Court of Appeals reversed. *State v. Suppah*, 264 Or App 510, 334 P3d 463 (2014) (en banc). We allowed the state's petition for review and now reverse the Court of Appeals decision and affirm the trial court's judgment.

## I. FACTS

In July 2010, defendant Roman Suppah was driving his girlfriend's car in Sherman County on Interstate 84.[1] Deputy Sheriff Hulke stopped defendant for a traffic violation. After being stopped, defendant "told [the deputy that] his name was Harold Pennington, born in 7/21/64." Defendant said that he lived in Warm Springs but that he did not "have a physical address or a mailing address." The deputy contacted the dispatcher to check the name and date of birth that defendant had given him. The dispatcher told him that "Pennington was driving while suspended," and defendant did not offer any proof of insurance.

The deputy cited defendant (as Pennington) for driving while suspended and driving without insurance. The deputy did not cite defendant for the traffic violation that had led him to stop defendant in the first place, nor did he make a written record of the reason why he had stopped defendant. As the deputy later explained, the traffic violation that had led him to stop defendant was one for which he normally gives drivers a warning but no citation.

---

[1] In the Court of Appeals, defendant assigned error to the trial court's ruling denying his motion to suppress. We take the facts from the evidence submitted at the hearing on that motion and state those facts consistently with the trial court's explicit and implicit findings.

A month later, in August, defendant called the Sherman County District Attorney's office and told them that his name was not Harold Pennington and that he, not Pennington, was the person whom the deputy had stopped on Interstate 84 in July. Defendant explained that he had been driving his girlfriend's car when the deputy stopped him, that he thought that Pennington had a valid driver's license, and that he had given the deputy Pennington's name because he did not want his girlfriend's car towed since he (defendant) did not have a driver's license. Defendant explained that he was coming forward with that information because he did not want to get his friend Pennington into trouble. Defendant later told the same information to two other law enforcement agencies.

Given defendant's statements in August, the state dismissed the charges against Pennington. However, it charged defendant with two misdemeanors: driving while suspended, ORS 811.182, and giving false information to a police officer, ORS 807.620. Before trial, defendant moved to suppress the false statements that he had made to the deputy in July and the true statements that he had made to the law enforcement agencies in August. He argued that the deputy had no basis for stopping him in July and that his statements in both July and August were the product of that illegality. At the hearing on defendant's motion, the deputy testified he had stopped defendant in July "for a traffic violation." However, the deputy could not remember "what that violation was." As noted, the deputy had not made a record of that violation but instead had cited defendant for driving while suspended and driving without insurance based on his understanding that defendant was Pennington.

Given the deputy's inability to remember the specific traffic violation that had led him to stop defendant, the state conceded that the stop was unlawful because it could not show any justification for the stop.[2] The state argued, however, that defendant's statements were attenuated from

---

[2] Constitutionally, an officer needs reasonable suspicion to stop a defendant. *See* *State v. Musser*, 356 Or 148, 158, 335 P3d 814 (2014) (reasonable suspicion required for investigatory stop). Statutorily, an officer must have "probable cause to believe" that a traffic violation has occurred when the officer stops a driver

the unlawful stop. For the most part, the state's attenuation argument focused on the statements that defendant had made in August, while defendant's counterargument focused on the statements that he had made in July. The trial court found that, although the stop was unlawful, defendant had given the deputy a false name and date of birth in July "to keep *** [from] having the car towed" and that he had come forward with truthful information in August "to keep his friend [Pennington] out of trouble." Given those findings, the trial court concluded that defendant's decision to give the deputy a false name in July and his decision to come forward with truthful information in August were not the product of the unlawful stop. The trial court accordingly denied defendant's motion to suppress.

Approximately six months later, the parties agreed to try the two charges to the court, primarily on the record created at the suppression hearing. Defendant moved for a judgment of acquittal on both charges. Regarding the charge of driving while suspended, he argued (and the state did not dispute) that the record failed to show whether his driver's license was suspended when the officer stopped him in July. Regarding the charge of giving false information to a police officer, defendant argued that there was no evidence to prove an element of that offense—that the deputy "[wa]s enforcing [the] motor vehicle laws" when defendant told him that he was Harold Pennington. *See* ORS 807.620(1).[3] The state responded that, because the deputy had testified that he stopped defendant "for a traffic violation," his testimony proved that he had been "enforcing [the] motor vehicle laws" when he stopped defendant. In the state's view, the deputy's lack of memory bore only on the constitutionality of the stop. After considering the evidence, the trial court found defendant guilty of giving false information to a police officer but not guilty of driving while suspended.

_____

"based on a description of the vehicle or other information received from [another] police officer who observed the traffic violation." ORS 810.410(2)(b).

[3] ORS 807.620(1) provides:

"A person commits the offense of giving false information to a police officer if the person knowingly uses or gives a false or fictitious name, address or date of birth to any police officer who is enforcing motor vehicle laws."

On appeal, defendant assigned error to the trial court's ruling denying his motion to suppress.[4] The Court of Appeals agreed with defendant that the trial court had erred and reversed the trial court's judgment. Relying on *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), the majority held that there was a casual connection between the stop and defendant's July statements and that the state had failed to establish attenuation. *Suppah*, 264 Or App at 518-28. In particular, the majority observed that there was no temporal break between the stop and those statements, that defendant reasonably believed that he had to answer the deputy's questions, and that no circumstances intervened to break the causal connection. *Id.* at 528. The majority explained that it was immaterial whether defendant made a conscious decision to lie to the deputy or to respond truthfully to his question. *Id.* at 530. Additionally, although the majority recognized that defendant's misrepresentation constituted a new crime, it held that only new crimes that threaten an officer's safety will attenuate the taint of an unlawful stop. *Id.* at 530-31.

The majority reached a different conclusion regarding the statements that defendant had made in August. It held that those statement were not a product of the unlawful stop. Although those statements were properly admitted, the majority concluded that their admission did not render the erroneous admission of the July statements harmless. Specifically, the majority accepted defendant's argument that the statements that he made in August were confessions, that uncorroborated confessions are insufficient to prove a crime, and that, without the July statements, nothing corroborated his August confessions. *Id.* at 531. The court accordingly concluded that the erroneous admission of defendant's July statements prejudiced him and required that his conviction for giving false information to a police officer be reversed.[5]

---

[4] Defendant did not assign error to the trial court's ruling on his motion for judgment of acquittal.

[5] The state has not disputed that defendant's August statements were confessions that required corroboration, nor has the state identified any corroborating evidence other than the July statements. Rather, the state has acquiesced in this aspect of the Court of Appeals reasoning.

Judge Hadlock dissented. The dissent recognized that, "but for" the unlawful stop, defendant would not have given the deputy a false name and date of birth. *Id.* at 535-36 (Hadlock, J., dissenting). The dissent reasoned, however, that "but for" causation does not require suppression and that defendant had made an independent decision to give the deputy a false name to avoid having his girlfriend's car towed. *Id.* It was important to the dissent's analysis that the state had not sought to exploit the stop by asking defendant questions that were intended or likely to reveal any further criminal activity. Rather, the deputy had asked for defendant's name in the ordinary course of enforcing the motor vehicle code. *Id.* at 538-39. Finally, the dissent found it significant that, in committing a new crime, defendant made a decision that went beyond what the officer had asked. *Id.* at 536. The dissent would have held that, because defendant's choice attenuated the taint of the unlawful traffic stop, his July statements were not the product of the illegality. *Id.* at 536.

## II.   ISSUES

On review, the state argues primarily that defendant's decision to commit a new crime attenuated the taint of the stop. Defendant responds initially that the state's new-crime argument rests on a false premise. Defendant reasons that, because the deputy was not "enforcing [the] motor vehicle laws," defendant's false statements to the deputy could not have violated ORS 807.620 and thus did not constitute a new crime. Alternatively, defendant argues that, even if his misrepresentations constituted a new crime, labeling conduct as a new crime does not answer whether that conduct derived from the illegality. The state, for its part, replies that defendant failed to preserve the argument that his conduct did not constitute a new crime.

We first explain why we conclude that defendant's initial argument—that his conduct did not constitute a new crime—is properly before us. We then explain why we conclude that defendant's conduct did constitute a new crime. Finally, we explain why defendant's decision to commit a new crime in response to the unlawful stop was sufficient to attenuate the taint of that stop.

A.  *Preservation*

To put the state's preservation argument in perspective, it is helpful to recount how the parties litigated this issue in the trial court and the Court of Appeals. In the hearing on defendant's suppression motion, the state did not argue that defendant's statements were attenuated from the stop because his conduct constituted a new crime. Rather, the state's attenuation argument focused on the statements that defendant had made in August. It was not until the state filed its respondent's brief in the Court of Appeals that the state argued that defendant's July statements were attenuated from the unlawful stop because defendant had committed a new crime by giving the deputy a false name and address.

Although the state did not make its new-crime argument at the suppression hearing, the trial court ruled in the state's favor on defendant's suppression motion. Under the "right for the wrong reason" doctrine, the state was free to argue for the first time in the Court of Appeals that the trial court's ruling on the suppression motion was correct because the commission of a new crime attenuated the taint of the unlawful stop. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (discussing "right for the wrong reason" doctrine).[6]

Defendant, for his part, did not respond to the state's new-crime argument in the Court of Appeals. The Court of Appeals, however, ruled in defendant's favor on his motion to suppress, and defendant was free to challenge the state's new-crime argument in this court for the same reason that the state was free to raise that argument for the first time in the Court of Appeals; that is, defendant can assert in this court that the Court of Appeals was "right for the wrong reason" just as the state could assert that the trial court was "right for the wrong reason" in the Court of Appeals.[7]

---

[6] Neither party argues that the facts would have been developed differently if the new-crime argument had been raised in the trial court. *See Outdoor Media Dimensions Inc.*, 331 Or at 660 (discussing that prerequisite for "right for the wrong reason" doctrine).

[7] The state's reply brief suggests that defendant's failure to assign error to the trial court's ruling on his motion for judgment of acquittal precludes him from

Thus, defendant's no-new-crime argument is properly before us. Because it is, we turn to the question whether defendant violated ORS 807.620(1) when he gave the deputy a false name and date of birth.

B. *ORS 807.620*

Defendant argues that the state's new-crime argument is incorrect because his conduct did not violate ORS 807.620. As we understand defendant's argument, it runs as follows: ORS 807.620(1) makes it a crime to give an officer a false name and date of birth only if the officer "is enforcing motor vehicle laws." In this case, the deputy could not remember the specific traffic violation that had led him to stop defendant, and defendant concludes from that fact that the stop was both unlawful and arbitrary. Defendant reasons that stopping drivers unlawfully and arbitrarily does not constitute "enforcing motor vehicle laws" within the meaning of ORS 807.620(1). It follows, he contends, that ORS 807.620(1) did not apply, and he was free to give the deputy a false name and date of birth.

Defendant's argument rests on two different premises—that the deputy was acting unlawfully and that he was acting arbitrarily. Whether either unlawful stops or arbitrary stops constitute "enforcing motor vehicle laws" presents related but separate questions. We begin with the question whether the fact that the stop was unlawful means that the deputy was not "enforcing [the] motor vehicle laws" within the meaning of ORS 807.620(1).

As noted, ORS 807.620(1) makes it a misdemeanor to "knowingly us[e] or giv[e] a false or fictitious name, address or date of birth to any police officer who is enforcing motor vehicle laws." The dependent clause in that subsection—"who is enforcing motor vehicle laws"—modifies

_____

arguing, in defense of the Court of Appeals' ruling on his motion to suppress, that the deputy was not enforcing the motor vehicle laws. The state, however, does not argue that issue preclusion applies, and we recently rejected an argument that the law-of-the-case doctrine bars a party from challenging a trial court ruling on direct appeal. *See Kennedy v. Wheeler*, 356 Or 518, 530-31, 341 P3d 728 (2014). As we explained in *Kennedy*, the question is whether the issue that a party raises on review was preserved. *Id.* For the reasons discussed above, the issue that defendant raises is properly before us.

and limits the phrase "any police officer." It defines a class of officers who are engaged in an activity (enforcing motor vehicle laws), and it recognizes legislatively what this court has recognized constitutionally—that, when an officer is enforcing the motor vehicle laws, it is both reasonable and necessary for the officer to determine the driver's identity and address. *See State v. Watson*, 353 Or 768, 782, 305 P3d 94 (2013) (holding that, under Article I, section 9, verifying driver's identity is reasonably related to traffic stop).

The text of the statute does not include the adverb—lawfully—that defendant would add. ORS 807.620(1) does not say that a driver's obligation to tell his or her true name to the officer applies only when an officer "lawfully" has stopped the driver in the course of enforcing the motor vehicle laws. Rather, the statute places an obligation on drivers to give their true names and dates of birth whenever an officer is enforcing the motor vehicle laws. To accept defendant's interpretation of the statute, we would have to add what the legislature omitted, a task that we may not undertake. *See US West Communications v. City of Eugene*, 336 Or 181, 188, 81 P3d 702 (2003) (stating interpretative principle).

The context is also at odds with defendant's interpretation. When the legislature has intended to require compliance only with a lawful order, it has said so explicitly. ORS 162.247(a), for example, prohibits a person from interfering with "the lawful duties" of an officer. Similarly, ORS 811.535 prohibits a person from refusing or failing to comply with "any lawful order." In the same vein, ORS 807.570 makes it a crime to fail to "present and deliver" a license to a police officer when requested by the police officer "*** [u]pon being *lawfully* stopped or detained when driving a vehicle." ORS 807.570(1)(b)(A) (emphasis added). In those statutes, the legislature used the word "lawful" or "lawfully" to narrow the range of police encounters in which each statute will apply. When the legislature has chosen to narrow similar statutes but not this one, we hesitate to add what the legislature has omitted. *See* ORS 174.010; *Pollin v. Dept. of Rev.*, 326 Or 427, 431, 952 P2d 537, *cert den*, 524 US 954 (1998).

The legislative history of ORS 807.620(1) is consistent with the statute's text and context. In 1977, the special courts committee of the judicial conference submitted a bill to add a subsection, which is now codified as ORS 807.620(1), to the traffic code. Minutes, House Committee on the Judiciary, HB 3238, Apr 21, 1977.[8] Testifying on behalf of the special courts committee, Judge Abraham explained that the bill was intended to "meet a growing problem in metropolitan areas," namely, "giving a false name in a traffic violation." *Id.* He said that "[a]t present there is no recourse for this situation" and that making it a misdemeanor to give officers a false name or address during a traffic violation would "at least provid[e] a tool for law enforcement agencies" to deal with the problem. *Id.* He acknowledged, however, that the only way to enforce the new law would be to have an investigative body follow up on the false name, "which sometimes can be done through the motor vehicle license number which also appears on citations." *Id.*

As that legislative history reveals, the 1977 legislature sought to provide a disincentive against giving a false name and address to police officers enforcing the motor vehicle laws. Nothing in the legislative history suggests that the legislature intended that that disincentive would apply only if the officer lawfully had stopped a driver for a traffic violation. Rather, the legislature sought to ensure that a person charged with violating the traffic laws could not avoid enforcement of those laws by giving the officer a false name or address. The history of ORS 807.620(1) is thus consistent with its text and context. It does not suggest that

---

[8] The 1977 amendment initially was codified as section 6 of *former* ORS 482.610 (1977), which prohibited false or fraudulent practices in applying for and displaying driver's licenses. In 1983, the legislature reorganized and recodified the motor vehicle laws. *See* Or Laws 1983, ch 338. In doing so, it codified the 1977 amendment as a separate statute and modified its wording slightly. As initially enacted, *former* ORS 482.610(6) (1977) prohibited giving certain false information "to any police officer for any violation of the motor vehicle laws." As revised in 1983, ORS 807.620 (1983) prohibited giving a false name, date of birth, or address to "any police officer who is enforcing the motor vehicle code." A staff analysis explained that, in reorganizing and recodifying the motor vehicle laws, the 1983 legislature made "no substantive changes" to those laws. Staff Measure Analysis, Senate Transportation and Tourism Committee, HB 2031 (May 23, 1983). In 1985, the legislature changed the phrase "the motor vehicle code" to "motor vehicle laws." Or Laws 1985, ch 16, § 160; Or Laws 1985, ch 597, § 22.

the legislature intended that drivers would have to provide truthful information only when the stop was lawful. It leads to precisely the opposite conclusion.

As noted, defendant raises a second issue. He contends that, because the deputy could not remember the specific traffic violation for which he had stopped defendant, the stop was arbitrary. It follows, he reasons, that an officer who arbitrarily stops drivers is not "enforcing motor vehicle laws." We assume that stopping drivers arbitrarily—namely, for no reason or any reason—does not constitute "enforcing [the] motor vehicle laws" within the meaning of ORS 807.620(1). However, the stop in this case was not "arbitrary" in that sense. The only testimony in the record is that the deputy stopped defendant "for a traffic violation" for which the deputy usually issued warnings. The trial court reasonably could conclude from that testimony, as it later did in finding that defendant had violated ORS 807.620(1), that the deputy was "enforcing [the] motor vehicle laws" when he stopped defendant for a traffic violation.

To be sure, the state has conceded that the deputy's inability to remember the specific violation that led him to stop defendant precluded the state from showing a sufficient justification for the stop. The state accordingly has acknowledged that the deputy's lack of memory rendered the stop "unlawful." However, the deputy's lack of memory did not render the stop "arbitrary," as defendant uses that term, nor did it mean that the deputy was not enforcing the motor vehicle laws when he stopped defendant. We accordingly agree with the trial court and the Court of Appeals that the deputy was "enforcing [the] motor vehicle laws."

C.  *Attenuation*

The remaining question is whether defendant's decision to give the deputy a false name and address in violation of ORS 807.620(1) attenuated the taint of the unlawful stop. On that issue, the state and federal courts consistently have held that a defendant's decision to commit a new crime in response to an unlawful seizure ordinarily will attenuate the taint of the seizure. *See* Wayne R. LaFave, 6 *Search and Seizure* § 11.4(j) at 483-91 (5th ed 2012) (discussing cases). That is true whether the new crime consists of assaulting

the arresting officer, attempting to bribe the officer, or making a "criminal misrepresentation in an effort to bring the incident to a close." *Id.* at 483-84 (footnote omitted). The only exceptions that courts have recognized to that rule have been where the officer's manner of stopping the defendant justified the defendant's response or where the officer exploited the illegality. *See id.* at 489-90.

In this case, defendant made a "criminal misrepresentation in an effort to bring the case to a close." *See id.* at 484. There is nothing in the manner in which the deputy carried out the stop that justified defendant's misrepresentation, nor did the deputy seek to exploit the stop. Rather, the deputy merely sought to determine the driver's identity so that he could issue an accurate citation or warning. If we were to follow the other state and federal courts that have considered this issue, we would conclude that defendant's decision to misrepresent his identity attenuated the taint of the unlawful stop, with the result that the statements that defendant subsequently made to the deputy were admissible in his trial for violating ORS 807.620(1).[9] Oregon, of course, analyzes issues under our constitution independently, and the fact that other jurisdictions would hold that defendant's criminal act attenuated the taint of the unlawful stop does not necessarily mean that we would reach the same conclusion under Article I, section 9. We turn to that question of Oregon law.

This court has not previously considered whether a defendant's decision to commit a new crime after being unlawfully seized will attenuate the taint of the seizure. However, this court has long recognized that a defendant may not resist arrest merely because the arrest was unlawful. *See State v. Wright*, 310 Or 430, 433, 799 P2d 642 (1990) (unlawful arrest provides no defense to charge of resisting arrest as long as "officer was acting under color of official authority"); *State v. Allen*, 152 Or 422, 53 P2d 1054 (1936) (same). Implicit in those cases is the proposition that a defendant's decision to resist arrest attenuates the taint of the

_____

[9] On review, defendant does not challenge the Court of Appeals' holding that his August statements were not the product of the July stop. Accordingly, we focus only on the statements that defendant made after being stopped in July.

unlawful arrest. This court, however, has never explained why that is so. We accordingly consider the premises on which those cases implicitly rest.

An unlawful arrest necessarily will be the "but for" cause of a defendant's decision to resist the arrest: But for the arrest, the defendant would not have resisted. However, this court has long recognized that "but for" causation is insufficient, standing alone, to establish that subsequently obtained evidence is the product of an illegality. *State v. Crandall*, 340 Or 645, 652, 136 P3d 30 (2006); *Hall*, 339 Or at 25. Rather, in determining whether evidence is the product of an illegal seizure, the court has considered the temporal proximity between the police conduct and the discovery of the evidence, the existence of intervening circumstances, and the presence of other circumstances—such as admonitions of constitutional rights—that bear on attenuation. *See State v. Unger*, 356 Or 59, 77, 333 P3d 1009 (2014) (taking those factors from *Hall*). The court also has considered the "nature, extent, and severity of the constitutional violation," as well as "the purpose and flagrancy of the misconduct." *Id.* at 86.

The court explained in *Unger* that close temporal proximity between the illegality and the discovery of evidence does not necessarily establish that the evidence is the product of the illegality. *Id.* at 77-78. Rather, depending on the other factors noted above, a defendant's voluntary decision "may be sufficient to demonstrate that the unlawful conduct did not affect or had only a tenuous connection to the evidence produced." *See id.* (discussing evidence discovered as result of consent to search that immediately followed unlawful search).

Considering those factors, we note that a defendant's decision to resist an unlawful seizure or to commit some other crime usually will follow closely on the seizure. Moreover, there ordinarily will be few, if any, intervening circumstances. Typically, what attenuates the act of resisting arrest (or other criminal conduct) from the unlawful seizure that preceded it is the defendant's decision to engage in an act that goes beyond the consequences that ordinarily flow from the illegality. *See Crandall*, 340 Or at 652-53

(defendant's act of hiding drugs under parked car after officers unlawfully had directed him to come over and talk to them attenuated taint of unlawful stop); *State v. Kennedy*, 290 Or 493, 624 P2d 99 (1981) (defendant's unsolicited invitation to search his luggage after officers unlawfully had stopped him attenuated taint of unlawful stop). A decision to strike an officer in response to an unlawful arrest or to offer a bribe does not normally follow from the illegality, and the formation of the mental state necessary to give rise to those criminal acts provides further assurance that those acts are independent of the illegality that preceded them. In those respects, the commission of a new crime in response to an illegality forms a relatively *sui generis* class of attenuating circumstances.

Those considerations guide our decision here. Ordinarily, a person stopped for a traffic violation will identify him or herself accurately. In choosing to misrepresent who he was and when he was born, defendant's response to the deputy's question went beyond what ordinarily would occur in much the same way that a defendant's decisions to resist arrest or to offer a bribe go beyond the consequences that ordinarily flow from an arrest. Moreover, in giving the deputy a false name and address in violation of ORS 807.620(1), defendant knowingly chose to do something other than what the deputy had asked. Finally, as the trial court found in denying defendant's motion to suppress, defendant gave the deputy a false name and address in July to prevent his girlfriend's car from being towed. The reason for defendant's misrepresentation was unconnected, other than in a "but for" sense, from the unlawful stop that preceded it.

We note, additionally, that the illegality in this case cannot be described as "intrusive, extended, or severe." *See Unger*, 356 Or at 81 (discussing that consideration). Rather, the trial court reasonably could have found that the stop was a brief, routine traffic stop that lasted no longer than necessary for the deputy to ask for and confirm defendant's name and date of birth. Nor can the illegality be described as flagrant. *See id.* at 82-83 (recognizing that purpose and flagrancy of illegality can affect attenuation analysis). Were it not for the deputy's inability to remember the specific traffic

violation that led him to stop defendant in the first place, there may have been no illegality at all. Put differently, from a temporal perspective, the illegality did not become apparent until months later at the suppression hearing when the officer could not remember which traffic violation had led him to stop defendant.

The trial court correctly concluded that the stop had no appreciable effect on defendant's decision to give the deputy a false name and date of birth. Because that decision attenuated the taint of the unlawful stop, the trial court correctly denied defendant's motion to suppress his statements. We accordingly affirm the trial court's judgment and reverse the Court of Appeals decision.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.