# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: _____**

**Filing Date: February 22, 2018**

**NO. S-1-SC-35183**

**STATE OF NEW MEXICO,**

Plaintiff-Petitioner,

v.

**EDWARD JAMES TAPIA, SR.,**

Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**William C. Birdsall, District Judge**

Hector H. Balderas, Attorney General
Kenneth H. Stalter, Assistant Attorney General
Santa Fe, NM

for Petitioner

Bennett J. Baur, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Respondent

**OPINION**

**MAES, Justice.**

{1}    In this case we address an issue of first impression: whether evidence of non-violent crimes committed in the presence of a police officer after an unconstitutional traffic stop must be suppressed under the Fourth Amendment of the United States Constitution (Fourth Amendment) and Article II, Section 10 of the New Mexico Constitution (Article II, Section 10).  Defendant Edward Tapia, Sr. entered a conditional plea of guilty to one count of forgery, for signing his brother's name to a traffic citation charging failure to wear a seat belt in a motor vehicle, and reserved his right to appeal.  *See State v. Tapia*, 2015-NMCA-055, ¶¶ 1, 5, 348 P.3d 1050.  He appealed to the Court of Appeals which reversed his conviction.  *Id.* ¶ 1.  The State petitioned for a writ of certiorari, which we granted.  *See* Rule 12-502 NMRA.

**I.    Facts and Procedure**

{2}    Because Defendant entered a conditional guilty plea, there was no trial.  Therefore, the facts are taken from the suppression hearing, the findings of fact and conclusions of law entered by the district court, and the plea hearing.  On August 8, 2012, Defendant and his companions were traveling westbound on U.S. Highway 64 toward Farmington, in San Juan County.  Defendant was a passenger in the back seat of the car.  New Mexico State Police Officer Tayna Benally stopped the car because

it was going forty miles per hour in a fifty-five-mile-per-hour zone and because she was unable to read the license plate. After contacting the driver, Benally noticed Defendant was not wearing a seat belt. When asked about this, Defendant told Benally he was wearing a lap belt. Benally asked him to lift his shirt so she could verify he was wearing a lap belt. Defendant complied and lifted his shirt, and Benally observed he was not wearing a lap belt. At this point, Benally asked Defendant for his driver's license. Defendant said he didn't have any identification. Benally then asked Defendant to write down his name, date of birth, and social security number. He wrote down "Robert Tapia DOB 03/22/1968" and said he did not know his social security number.

{3} Benally contacted San Juan County Dispatch and asked for a description of Robert Tapia. The description given was inconsistent with Benally's observations of Defendant's appearance. Despite the inconsistencies, Benally issued a "no seat belt" citation for Robert Tapia, and Defendant signed the citation as Robert Tapia.

{4} While Benally was dealing with Defendant, another officer at the scene spoke with a second male passenger. The second passenger informed the second officer that Defendant's real name was Edward Tapia. The second officer had Defendant exit the car and confirm his name. Defendant said his name was Robert Tapia but then

2

restated his birth date as March 22, 1974. The second officer informed Benally of what the second passenger had told him, and Benally then arrested Defendant for concealing identity. Later, at the jail, Defendant's real identity was confirmed as Edward Tapia. His birth date and social security number were also confirmed, and Benally discovered there was an outstanding warrant for Defendant's arrest for failing to appear at the San Juan Magistrate Court in Aztec, New Mexico.

{5} Defendant was charged with forgery, contrary to NMSA 1978, Section 30-16-10(A) (2006); concealing identity, contrary to NMSA 1978, Section 30-22-3 (1963); and seat belt violation, contrary to NMSA 1978, Section 66-7-372(A) (2001).

{6} Defendant filed in the Eleventh Judicial District Court a motion to suppress all evidence obtained by Benally, challenging the constitutionality of the traffic stop. The district court heard the motion to suppress, held that the traffic stop was unlawful because the driver had made no moving violations and the license plate was concededly visible to the officer, and suppressed the evidence of the seat belt violation. However, the evidence of concealing identity and forgery was not suppressed. The district court found that those crimes "had not yet been committed at the time of the stop," that "[e]vidence of those crimes did not exist at the time of the stop," and concluded that "an unlawful stop does not justify the commission of

new crimes."

{7} Defendant entered a conditional guilty plea to the forgery charge, admitted to two prior offenses for habitual sentencing purposes, and reserved the right to appeal the suppression issue as to both forgery and concealing identity. The district court accepted the plea and sentenced Defendant to eighteen months in the Department of Corrections, with all but forty-five days of the sentence suspended in favor of unsupervised probation. Pursuant to the plea, the Defendant appealed his conviction to the Court of Appeals.

{8} The Court of Appeals reversed the ruling of the district court and held that "the commission of a non-violent, identity-related offense in response to unconstitutional police conduct does not automatically purge the taint of the unlawful police conduct under federal law." *Tapia*, 2015-NMCA-055, ¶ 17. The Court of Appeals then engaged in an attenuation analysis and held that "the discovery of the evidence of concealing identity and forgery was not sufficiently removed from the taint of the illegal stop to justify admitting the evidence notwithstanding the exclusionary rule." *Id.* ¶ 19. Concluding that the crimes of concealing identity and forgery should have been suppressed under the Fourth Amendment, the Court of Appeals did not reach defendant's state constitutional claim. *Id.* ¶ 20.

{9} The State petitioned for certiorari to review the issue of whether a new crime exception to the exclusionary rule, which this court has previously recognized for violent crimes, also applies to non-violent, identity-related crimes. *See* N.M. Const. art. VI, § 3; NMSA 1978, § 34-5-14 (1972); Rule 12-502. We granted certiorari under Rule 12-502(C)(2)(d)(iii) as this case presents a significant constitutional question.

## II. Standard of Review

{10} "In reviewing a trial court's denial of a motion to suppress, we observe the distinction between factual determinations which are subject to a substantial evidence standard of review and application of law to the facts[,] which is subject to de novo review." *State v. Nieto*, 2000-NMSC-031, ¶ 19, 129 N.M. 688, 12 P.3d 442 (alteration in original) (internal quotation marks and citation omitted). The district court made findings of facts and conclusions of law. The parties do not dispute the pertinent facts, only the application of law to those facts; therefore, our review is de novo. *Id.* ¶ 19; *see State v. Pierce*, 2003-NMCA-117, ¶¶ 1, 10, 134 N.M. 388, 77 P.3d 292 (stating that when the facts are not in dispute on a motion to suppress, we determine whether the law was correctly applied to those facts).

## III. Discussion

5

{11} The State argues that the new crime exception to the exclusionary rule does not make a categorical distinction between violent and non-violent crimes and that the potential deterrence of unlawful searches and seizure by the State is outweighed by the cost of excluding evidence of identity crimes. Defendant asks this Court to affirm the Court of Appeals ruling that the crimes of concealing identity and forgery should have been suppressed under the Fourth Amendment and asks alternatively for suppression under Article II, Section 10.

{12} Under the interstitial approach adopted in *State v. Gomez*, 1997-NMSC-006, ¶ 21, 122 N.M. 777, 932 P.2d 1, we ask "first whether the right being asserted is protected under the federal constitution. If it is, then the state constitutional claim is not reached." *Id.* ¶ 19. If it is not, we examine the state constitutional claim. *Id.* However, "we may diverge from federal precedent where the federal analysis is flawed, where there are structural differences between the state and federal governments, or because of distinctive New Mexico characteristics." *State v. Garcia*, 2009-NMSC-046, ¶ 27, 147 N.M. 134, 217 P.3d 1032 (citing *Gomez*, 1997-NMSC-006, ¶ 19).

**A. Attenuation Doctrine and the New Crime Exception**

{13} The Fourth Amendment prohibits unreasonable searches and seizures by

police. *Herring v. United States*, 555 U.S. 135, 139 (2009). "As a general rule, the federal constitution . . . requires suppression of evidence obtained in a manner that runs afoul of the Fourth Amendment." *State v. Santiago*, 2010-NMSC-018, ¶ 10, 148 N.M. 144, 231 P.3d 600. The requirement that evidence obtained as a result of an unconstitutional search or seizure be suppressed is known as the "exclusionary rule." *State v. Ingram*, 1998-NMCA-177, ¶ 9, 126 N.M. 426, 970 P.2d 1151. The purpose of the exclusionary rule under the Fourth Amendment has been articulated as the deterrence of unlawful government behavior. *See Elkins v. United States*, 364 U.S. 206, 217 (1960) (stating purpose of the exclusionary rule is "to deter—to compel respect for the constitutional guaranty . . . by removing the incentive to disregard it"). "[T]he exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). The rule is not absolute, but "applicable only . . . where its deterrence benefits outweigh its substantial social costs." *Strieff*, 136 S. Ct. at 2061 (omission in original) (internal quotation marks and citation omitted).

**{14}** The United States Supreme Court has thus recognized three exceptions to the

exclusionary rule involving the causal relationship between the unconstitutional act and the discovery of evidence.

> First, the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source. Second, the inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source. Third . . . is the attenuation doctrine: Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.

*Id.* at 2061 (omission in original) (internal quotation marks and citations omitted).

{15} Under the attenuation doctrine, the government can admit evidence when "the relationship between the unlawful search or seizure and the challenged evidence becomes sufficiently weak to dissipate any taint resulting from the original illegality." *United States v. Smith*, 155 F.3d 1051, 1060 (9th Cir. 1998). The United States Supreme Court in *Brown v. Illinois* identified three factors by which a court may determine if seized evidence has been purged of the taint of the original illegality: (1) the lapsed time between the illegality and the acquisition of the evidence, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *See* 422 U.S. 590, 603-04 (1975).

{16} "It was [the attenuation doctrine] that spawned the new crime exception to the

8

exclusionary rule." Christopher J. Dunne, *State v. Brocuglio: The Supreme Court of Connecticut's Modification of the New Crime Exception to the Exclusionary Rule*, 23 QLR 853, 860 (2004). The new crime exception was first articulated by the Eleventh Circuit Court of Appeals in *United States v. Bailey*, 691 F.2d 1009 (11th Cir. 1983). *See* Dunne, *supra*, at 861. In *Bailey*, the Court of Appeals held that "notwithstanding a strong causal connection in fact between lawless police conduct and a defendant's response, if the defendant's response is itself a new, distinct crime, then the police constitutionally may arrest the defendant for that crime." 691 F.2d at 1016-17.

{17}     Whether the new crime exception is part of the attenuation doctrine or a separate exception to the exclusionary rule is unclear. 1 *McCormick on Evidence* § 180, at 972-73 (Kenneth S. Broun ed., 7th ed. 2013) ("Some courts appear to regard the doctrine as simply a specialized application of the attenuation of taint doctrine, under which intervening voluntary criminal conduct usually and perhaps inevitably attenuates the taint of illegality preceding that conduct. . . . Other courts appear to regard the doctrine as a separate exception to exclusionary requirements, based on considerations distinguishable from those supporting the attenuation of taint

9

doctrine." (footnotes omitted)).[1]

{18}    The Tenth Circuit Court of Appeals adopted the new crime exception in *United States v. Waupekenay*, 973 F.2d 1533 (10th Cir. 1992), a case that arose out of New Mexico.  In *Waupekenay*, the defendant pointed a rifle at tribal officers after they unlawfully entered his home.  *Id.* at 1535.  The Court concluded that despite the unlawful entry, the defendant no longer had a reasonable expectation of privacy when he assaulted the officers and that the evidence against him would not be suppressed under the Fourth Amendment.  *Id.* at 1536-38.  The opinion notes that courts have applied different rationales in similar cases but concludes "whatever rationale is used, the result is the same: Evidence of a separate, independent crime initiated against police officers in their presence after an illegal entry or arrest will not be suppressed under the Fourth Amendment."  *Id.* at 1538.

{19}    *Waupekenay* involved a defendant reacting violently toward police officers, and many states, including New Mexico, have adopted the new crime exception to the exclusionary rule in such cases.  *Id.* at 1537 (listing numerous cases); *see State v. Travison B.*, 2006-NMCA-146, ¶ 11, 140 N.M. 783, 149 P.3d 99.  In *Travison B.*, officers improperly entered the scene of a domestic disturbance and encountered an

_____

[1]The State asserts that "[t]here is no categorical or bright-line [new crime] exception."

10

angry child, who then battered the officers. 2006-NMCA-146 ¶ 2. The Court of Appeals essentially adopted the new crime exception without explicitly stating so when it concluded that "[a]lthough precipitated by the [unlawful] entry, [c]hild's actions against the officers constituted new criminal activity that is not subject to the exclusionary rule." 2006-NMCA-146, ¶ 9.

{20} Cases where defendants committed an identity-related crime in the presence of police after an unlawful search or seizure are much less common but do exist. Two federal appellate courts have ruled that identity-related crimes committed in the presence of officers after an illegal seizure were not protected under the Fourth Amendment. *See United States v. Pryor*, 32 F.3d 1192,1195-1196 (7th Cir. 1994) (involving a defendant's misrepresentation of identity to federal agents); *United States v. Garcia-Jordan*, 860 F.2d 159, 161 (5th Cir. 1988) (holding that a defendant's false statement of citizenship was a new and distinct crime committed in the border agent's presence and not barred by the exclusionary rule).

{21} Some state courts have also held that identity crimes committed after a Fourth Amendment violation fall under the new crime exception to the exclusionary rule. *See, e.g.*, *People v. Diamond*, 353 N.Y.S.2d 688, 690-91 (1974) (impersonating a transit authority conductor was a new crime not tainted by illegal arrest); *State v.*

11

*Suppah*, 369 P.3d 1108, 1112 (Or. 2016) (*Suppah II*) (concluding a defendant's commission of new crime of providing deputy with false name and address sufficiently attenuated taint of illegal stop); *State v. Earl*, 2004 UT App 163, ¶¶ 23-24, 92 P.3d. 167 (holding that a defendant giving officer a false name and birth date was an intervening act and not the product of the officer's illegal entry into the home in which defendant was staying); *but see State v. Brocuglio*, 779 A.2d 793, 801-802 (Conn. App. Ct. 2001) (holding that a defendant's verbal utterances to the officers requesting that they leave his property or he would let his dog loose did not constitute a new, distinct crime).

{22}    Defendant asks us to limit the application of the attenuation for new crimes to only those cases where an individual endangers the safety of police or the public. Defendant points out that in New Mexico the early cases holding new crimes that were sufficiently attenuated from the initial illegality involved assaults and threats against officers during unlawful searches and seizures. *See, e.g.*, *State v. Chamberlain*, 1989-NMCA-082, 109 N.M. 173, 783 P.2d 483; *State v. Doe*, 1978-NMSC-072, 92 N.M. 100, 583 P.2d 464. Based on that history, Defendant suggests that the new crime attenuation analysis was "meant to protect police officers and the public from violent conduct." And Defendant points out that the analysis has evolved

12

into a "virtually automatic and deeply-ingrained exception to the exclusionary rule" when the case involves violence, threats, or resistance to law enforcement officers. *See, e.g.*, *United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir.1997) (holding that firing of gun at officer after initial unlawful stop triggered exception to exclusionary rule); *People v. Villarreal*, 604 N.E.2d 923, 928 (Ill. 1992) (declining to apply exclusionary rule to suppress evidence of aggravated battery regardless of legality of officers' entry into home); *Commonwealth v. Johnson*, 245 S.W.3d 821, 824 (Ky. Ct. App. 2008) (finding illegal entry into residence by police officer did not render evidence of subsequent assault against officer inadmissible under exclusionary rule); *State v. Herrera,* 48 A.3d 1009, 1026 (N.J. 2012) (finding exclusionary rule does not apply to evidence of defendants' attempt to murder state trooper, regardless of the illegality of the initial stop).

{23}     The State contends the Court of Appeals applied the correct analysis to the facts but came to the wrong conclusion in reversing the district court. According to the State, the Court of Appeals erred "in weighing the potential for deterrence too greatly and discounting the societal cost of excluding evidence of identity crimes." The State submits that under federal law there should always be a balancing of the costs and benefits of exclusion and that the Court of Appeals improperly discounted

the costs of excluding evidence of non-violent, identity-related crimes. The State also suggests that non-violent crimes can be as socially harmful as violent crimes and that we should look to the penalty for an offense as it "'reveals the legislature's judgment about the offense's severity.'" (quoting *Lewis v. United States*, 518 U.S. 322, 326 (1996) (discussing the right to jury trial)).

{24}     By contrast, Defendant directs this Court to three cases from other jurisdictions that have declined to extend the new crime exception to non-violent acts by a defendant: *People v. Brown*, 802 N.E.2d 356 (Ill. App. Ct. 2003), *State v. Badessa*, 885 A.2d 430 (N.J. 2005), and *State v. Suppah*, 334 P.3d 463 (Or. Ct. App. 2014) (*Suppah I*).  We find these cases distinguishable for the reasons below.

{25}     With regard to *Suppah*, the Oregon Supreme Court has reversed the Oregon Court of Appeals in *Suppah I* since Defendant filed his brief.  *See Suppah II*, 369 P.3d at 1108.  The facts in *Suppah* are similar to this case.  The defendant in *Suppah* was driving his girlfriend's car and was stopped for a traffic violation that was later determined to be improper. *Id.* at 1110-11.  The defendant knew his driver's license was suspended and did not want his girlfriend's car to get towed, so he gave the deputy his friend's name and birth date and said he did not have a physical or mailing address. *Id.* at 1110.  The deputy checked the information with a dispatcher who told

the deputy that the false name came back as having a suspended license. *Id.* The deputy cited the defendant for driving on a suspended license but did not cite the defendant for the traffic violation that led him to stop the defendant in the first place. *Id.*

{26} A month after the traffic stop, the defendant called the police and told them he had lied about his name. *Id.* As a result, the state dismissed the charges against the defendant's friend and charged the defendant with driving while suspended and giving false information to a police officer. *Id.* Before trial, the defendant moved to suppress the false statements he made to police when he was stopped and the statements he made a month afterward. *Id.* at 1110-11. The trial court denied the motion to suppress, concluding that the defendant's decision to give the deputy a false name and his decision to come forward with truthful information a month later were not the product of the unlawful stop. *Id.* After a bench trial, the court found the defendant guilty of giving false information to a police officer but not guilty of driving while suspended. *Id.*

{27} On initial appeal, the Oregon Court of Appeals agreed with the defendant that the evidence should have been suppressed and reversed the trial court's judgment. *Suppah I*, 334 P.3d at 476. The Oregon Supreme Court reversed the Court of Appeals

and affirmed the trial court's denial of the motion to suppress. *Suppah II*, 369 P.3d at 1117, concluding that "in giving the deputy a false name and address . . . , defendant knowingly chose to do something other than what the deputy had asked. . . . The reason for defendant's misrepresentation was unconnected, other than in a 'but-for' sense, from the unlawful stop that preceded it." *Id.* at 1116. The Oregon Supreme Court held "the stop had no appreciable effect on the defendant's decision to give the deputy a false name and date of birth," and it was the defendant's independent, unprompted decision that "attenuated the taint of the unlawful stop." *Id.* at 1117.

{28}    Second, Defendant relies on the holding in *Badessa* where the New Jersey Supreme Court found that evidence gathered by the police after an unconstitutional traffic stop should have been excluded in a prosecution for refusal to submit to a breathalyzer test. *See* 885 A.2d 430. In *Badessa*, the defendant was stopped by police after he turned onto a side street in an apparent attempt to evade a DWI checkpoint. *Id.* at 433. Police observed signs of intoxication coming from the defendant and had him perform field sobriety tests. *Id.* After completing the tests, the officer arrested the defendant for driving while under the influence. *Id.* Later at the police station, the defendant refused to submit to a breathalyzer test, so he was

16

charged with DWI and refusal to submit to a breathalyzer test which is a distinct crime under New Jersey law. *Id.* The defendant challenged the legality of the stop. The trial court found that the officer did not have probable cause to stop the defendant for DWI but did have probable cause to request the breathalyzer test and acquitted the defendant on the DWI charge but convicted him for refusing the breathalyzer test. *Id.* at 433. An appellate panel concluded that although the officer lacked probable cause for the stop, there was probable cause to support the request for the breathalyzer test. *Id.* at 434. The panel affirmed the conviction for refusing to submit to the breathalyzer test, indicating that the refusal was sufficiently attenuated from the illegal stop to justify admission of the refusal evidence. *Id.*

{29} The New Jersey Supreme Court disagreed, stating:

> Under the present circumstances, we cannot subscribe to the [s]tate's position that a breathalyzer refusal and DWI are distinct for purposes of an exclusionary rule analysis. . . . The facts necessary to prosecute those two offenses are inextricably intertwined. After all, to secure a refusal conviction, the [s]tate must prove that the arresting officer had probable cause to believe that the person had been driving while under the influence and was placed under arrest for DWI."

*Id.* at 436 (internal quotation marks and citations omitted).

{30} The New Jersey refusal statute's dual requirements of probable cause and an arrest for DWI were critical to the refusal analysis and thus the outcome of the case.

17

In other words, the New Jersey statute rendered the crime of refusing a breath test "inextricably intertwined" with a DWI arrest and compelled a conclusion that refusal could not be attenuated from an initial stop for DWI. *Id.*; *see* N.J. Stat. Ann. § 39:4-50.4a. The *Badessa* case is thus distinguishable from the present case based on the specific crimes at issue and the New Jersey refusal statute's treatment of those crimes.

{31} No such specific statutory treatment applies to the crimes with which Defendant was charged in this case. In New Mexico, concealing identity and forgery may be distinct crimes from, and not conditioned upon, conduct giving rise to an initial stop. *See State v. Ruffins*, 1990-NMSC-035, ¶ 11, 109 N.M 668, 789 P.2d 616 (holding that forgery is completed when a defendant possessing the requisite intent: (1) falsely makes or alters a writing which purports to have legal efficacy, (2) physically delivers a forged writing, or (3) passes an interest in a forged writing); § 30-22-3 ("Concealing identity consists of concealing one's true name or identity, or disguising oneself with intent to obstruct the due execution of the law or with intent to intimidate, hinder or interrupt any public officer or any other person in a legal performance of his duty or the exercise of his rights under the laws of the United States or of this state.").

18

{32} Finally, *People v. Brown* is no more persuasive. In *People v. Brown*, a police officer unlawfully detained Brown simply because he was standing in front of a closed business. 802 N.E.2d at 357-58. The officer asked Brown for identification and Brown replied he had none. *Id.* at 358. When the officer asked Brown for his name, address, and date of birth, Brown provided a false name and date of birth. *Id.* The officer then radioed in this information and discovered there was a warrant for Brown's arrest. *Id.* Brown was ultimately charged with obstructing justice, giving a false name, and falsely stating that he was not carrying identification. *Id.* Brown moved to suppress his statements as they were obtained as a result of his unlawful detention. *Id.* at 357-58. The trial court granted the motion to suppress. *Id.* at 357. The state appealed, and the Appellate Court of Illinois affirmed the trial court, concluding that Brown was simply responding to the officer's questioning in conjunction with the illegal seizure and that "[r]efusing to provide identification does not raise the same policy concerns as assaulting a law enforcement officer." *Id.* at 360.

{33} We decline to follow the reasoning in *People v. Brown*, 802 N.E.2d at 368. While we acknowledge that like the defendant in *People v. Brown*, Defendant was unlawfully seized when speaking with Benally, Defendant's statements to Benally

19

were not directly connected to the seizure except in a "but-for" sense. Benally's observation that Defendant was not wearing a seat belt prompted her to ask him for identification. There is nothing that indicates Benally obtained the evidence of Defendant's false statements by exploiting the unlawful seizure.

{34}     The parties do not dispute the district court's finding that Benally lacked reasonable suspicion to initiate the traffic stop. The question before this Court is: do the *Brown v. Illinois* factors suggest Defendant's conduct was sufficiently attenuated between the initial stop and Defendant's false identification to render the exclusionary rule inapplicable to the new evidence. This is an issue of first impression before the Court.

{35}     We now apply the three general attenuation factors from *Brown v. Illinois* to assess the attenuation in this case between the illegal police conduct and the discovery of evidence. The first consideration requires that we review the lapsed time between the illegality and the acquisition of the evidence, which in this case favors suppression, as it was only a short time between the traffic stop and Defendant's false identification. A little more time passed before Defendant signed the traffic citation containing his brother's identifiers, but it was still only minutes.

{36}     The second consideration requires that we look to any intervening

circumstances that serve to attenuate the illegal detention from the discovery of the evidence. An intervening circumstance is one that breaks the relationship between the illegal conduct and the evidence obtained. Various courts have concluded a defendant's independent criminal act may itself constitute an intervening circumstance sufficient to purge the taint of the initial illegality. *United States v. King*, 724 F.2d 253, 256 (1st Cir. 1984) (concluding a "shooting was an independent intervening act which purged the taint of the prior illegality"); *State v. Nelson*, 2015 OK CR 10, ¶ 23, 25, 356 P.3d 1113 (holding defendant's behavior in walking away from traffic stop for failing to signal left-hand turn was an intervening circumstance which purged any taint originating from the illegal stop). To hold otherwise "would allow a defendant carte blanche authority to go on whatever criminal rampage he desired and do so with virtual legal impunity as long as such actions stemmed from the chain of causation started by the police misconduct." *See State v. Miskimins*, 435 N.W.2d 217, 221 (S.D.1989). And in many scenarios, courts conclude that even independent, non-violent criminal acts following an unlawful detention may constitute intervening circumstances, reasoning that the conduct is neither natural nor predictable, and thus insufficiently connected to the initial illegality to warrant application of the exclusionary rule. *See, e.g.*, *Ellison v. State*, 410 A.2d 519, 527

21

(Del. Super. Ct. 1979).

{37} Here, Defendant's misrepresentation of his identity was such an intervening circumstance. Although the interaction between the police and Defendant came about initially as a result of the unlawful seizure, the Defendant's response to Officer Benally was not a natural or predictable progression from the unlawful seizure but rather an unprompted act of his own free will.

{38} The third consideration requires that we assess the purpose and flagrancy of the police misconduct. Nothing in the record indicates that Benally initiated the traffic stop for the specific purpose of investigating Defendant or for some other merely pretextual reason. And nothing indicates Benally approached and addressed Defendant for arbitrary reasons or to provoke additional wrongdoing; rather, she addressed Defendant based on her observation that he was not wearing a seat belt. Benally had probable cause to believe that Defendant was violating the law; and under conditions of a lawful traffic stop, her course of conduct thereafter would not have been unlawful. This third consideration tips the balance away from suppression because nothing suggests that admission of the evidence will embolden police to engage in unconstitutional traffic stops. Benally's behavior cannot reasonably be viewed as flagrant misconduct of a police officer searching for evidence.

22

Accordingly, the Fourth Amendment analysis does not require excluding evidence of concealing identity because it was free of the taint of the unlawful seizure.

**B.    State Constitutional Grounds**

{39}    Because we conclude that the Fourth Amendment does not offer Defendant protection here, we must address his challenge under Article II, Section 10.  *See Gomez*, 1997-NMSC-006, ¶ 19.  Under the interstitial approach we adopted in *Gomez*, "we may diverge from federal precedent where the federal analysis is flawed, where there are structural differences between the state and federal governments, or because of distinctive New Mexico characteristics." *Garcia*, 2009-NMSC-046, ¶ 27.

**1.    Preservation of State Constitutional Issue**

{40}    Because the Court of Appeals found the crimes of concealing identity and forgery should have been suppressed under the Fourth Amendment, it did not address Defendant's challenge under Article II, Section 10.  Therefore, as an initial matter, we must determine whether Defendant properly preserved his argument under the New Mexico Constitution for appellate review. *See State v. Ketelson*, 2011-NMSC-023, ¶ 10, 150 N.M. 137, 257 P.3d 957.  The State concedes that defendant's state constitutional claim was adequately preserved. Nevertheless, the rule of preservation must still be met.  The requirements for preservation of state constitutional claims

were enunciated in *Gomez*, 1997-NMSC-006, ¶¶ 22-23. When, as is the case here, a state constitutional provision has previously been interpreted more expansively than its federal counterpart, trial counsel must develop the necessary factual basis and raise the applicable constitutional provision in trial court. *Id.* ¶ 22.

{41} Defendant explicitly cited Article II, Section 10 in his motion to suppress. However, in his motion to suppress, Defendant only discussed the facts leading up to the traffic stop to argue the officer lacked reasonable suspicion. Very few facts regarding the crimes of concealing identity and forgery were developed in the motion hearing. It is in the findings of fact and conclusions of law that the district court states, "[I]t was during the issuance of the citation that the charged crimes of concealing identity and forgery are alleged to have occurred." The district court concluded that an unlawful stop does not justify the commission of new crimes and that the evidence of the forgery and concealing identity was admissible at trial.

{42} We find that despite this marginal record, the necessary factual basis was still developed and the district court's ruling was fairly invoked. Therefore, Defendant's Article II, Section 10 challenge was adequately preserved. We next determine whether Article II, Section 10 affords Defendant greater protection than the Fourth Amendment and requires suppression of the evidence of the crimes of concealing

identity and forgery committed after an unlawful traffic stop.

## 2. Article II, Section 10

{43} Article II, Section 10 provides that "[t]he people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures . . . ." N.M. Const. art. II, § 10. Similar to the Fourth Amendment, this clause embodies "the fundamental notion that every person in this state is entitled to be free from unwarranted governmental intrusions." *State v. Gutierrez*, 1993-NMSC-062, ¶ 46, 116 N.M. 431, 863 P.2d 1052. "The key inquiry under Article II, Section 10 is reasonableness." *Ketelson*, 2011-NMSC-023, ¶ 20. "We avoid bright-line, per se rules in determining reasonableness; instead, we consider the facts of each case." *State v. Granville*, 2006-NMCA-098, ¶ 18, 140 N.M. 345, 142 P.3d 933.

{44} Defendant argues that upholding the district court ruling would create a bright-line, per se standard whereby the commission of non-violent identity offenses would always be sufficient to purge the taint of an unconstitutional seizure and would thus contradict our preference to consider the facts of each case. Defendant also argues that unlike the federal exclusionary rule, which only applies "where its deterrence benefits outweigh its substantial social costs," *Pennsylvania Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998) (internal quotation marks and citation omitted), the

25

primary focus of the state exclusionary rule is securing privacy interests, which is achieved by putting individuals in the same position as if the misconduct had not occurred, *see State v. Trudelle*, 2007-NMCA-066, ¶ 40, 142 N.M. 18, 162 P.3d 173 ("The purpose of the state exclusionary rule[, to ensure freedom from unreasonable search and seizure,] is accomplished by doing no more than return the parties to where they stood before the right was violated."). Finally, Defendant argues that the three-factor federal attenuation analysis is flawed in that it fails to account for the greater protection of privacy granted under Article II, Section 10.

{45} The State argues that the Court of Appeals properly applied the federal analysis but neglected to balance the costs and benefits of exclusion and that as a result, the Court of Appeals drew a categorical distinction between violent and non-violent new crimes which will lead to a systematic under-valuation of the societal costs of excluding evidence of crimes such as forgery or giving a false identity. The State suggests that this Court adopt an appropriate balancing test for evaluating attenuation under the state Constitution.

{46} While we have repeatedly expressed that Article II, Section 10 provides broader protection of individual privacy than the Fourth Amendment, the key inquiry is still one of reasonableness, which "depends on the balance between the public

26

interest and the individual's interest in freedom from police intrusion upon personal liberty." *Ketelson*, 2011-NMSC-023, ¶ 20. Article II, Section 10 is "a foundation of *both* personal privacy and the integrity of the criminal justice system, as well as the ultimate regulator of police conduct." *State v. Garcia*, 2009-NMSC-046, ¶ 31 (emphasis added). "To evaluate whether a search and seizure violates the protections of the New Mexico Constitution, courts judge 'the facts of each case by balancing the degree of intrusion into an individual's privacy against the interest of the government in promoting crime prevention and detection.'" *State v. Davis*, 2015-NMSC-034, ¶ 100, 360 P.3d 1161 (*Davis II*) (Chávez, J., specially concurring) (quoting *State v. Jason L.*, 2000-NMSC-018, ¶ 14, 129 N.M. 119, 2 P.3d 856).

{47} Application of the three-part federal attenuation analysis comports with our preference to assess the reasonableness of law enforcement by considering the totality of the circumstances of each case. *See State v. Leyva*, 2011-NMSC-009, ¶ 55, 149 N.M. 435, 250 P.3d 861. Defendant's assertion that the federal attenuation analysis is flawed because it fails to account for the heightened protections of privacy under Article II, Section 10 is unpersuasive. The federal attenuation analysis has already been applied to Article II, Section 10 in instances involving confessions or consent to search. In *State v. Monteleone*, 2005-NMCA-129, ¶¶ 17, 21, 138 N.M. 544, 123

P.3d 777, the Court of Appeals applied the three-part federal analysis to determine whether the defendant's consent to search his apartment was sufficiently attenuated from the taint of the officers' illegal entry. 2005-NMCA-129, ¶¶ 18-19. The Court concluded that the defendant's consent was not sufficiently attenuated from the officers' illegal entry and therefore suppressed the state's evidence under both the Fourth Amendment and Article II, Section 10. *Id.* ¶¶ 21-22. Though *Monteleone* dealt with a defendant's consent to search, the application of the attenuation analysis protected Monteleone's state constitutional rights, and we do not see why its application in that case or in this case is flawed. In addition, the greater protections afforded vehicle passengers in New Mexico are not through an application of the federal attenuation factors to this case. *See, e.g.*, *State v. Portillo*, 2011-NMCA-079, ¶ 22-23, 150 N.M. 187, 258 P.3d 466 (holding Article II, Section 10, unlike Fourth Amendment, allows officer to only ask passenger questions related to the reason for the stop or otherwise supported by reasonable suspicion).

{48} While Officer Benally's decision to initiate the stop was mistaken, her conduct thereafter was lawful. Officer Benally reasonably requested Defendant's identification after observing the seat belt violation. We therefore conclude that the benefits of deterrence in this case are not outweighed by the cost of excluding the

28

evidence of Defendant's crimes. Though a passenger in an automobile has a right to be free of unreasonable seizure by the government, the passenger's unprovoked and willful criminal acts after an unreasonable traffic stop cannot be sanctioned. The violation of Defendant's Fourth Amendment or Article II, Section 10 rights does not confer upon him a license to commit new crimes, whether they be physical resistance or more passive forms of resistance to government authority. *See Waupekenay*, 973 F.2d at 1537. Accordingly, we conclude that the important principle of deterrence of police misconduct does not weaken the exclusionary rule under Article II, Section 10, and all evidence obtained by flagrant or deliberate misconduct shall be suppressed. But were we to draw a line based merely upon the nature of the violation, it would embolden individuals to engage in non-violent yet still criminal acts that compromise the integrity of the criminal justice system. Defendant's impersonation of his brother and forging his brother's signature on a traffic citation could have caused his brother real harm had it not been discovered. Forgery was a third-degree felony until the statute was amended in 2006 to make it a fourth-degree felony when there is no quantifiable damage or the damage is $2,500 or less. *See* § 30-16-10(B). The 2006 amendment also made forgery a second-degree felony when the damage is over $20,000. *See* § 30-16-10(E). The fact that the Legislature chose to keep all forgeries

as felony offenses and increased the punishment for serious forgery cases shows it considers this crime harmful to society.

{49} Finally, Defendant does not present any basis for us to conclude that this case involves structural differences between the federal and state governments other than the differences already articulated between the Fourth Amendment and Article II, Section 10. However, our finding that the new crimes sufficiently purged the taint of the primary illegality removed those crimes from the greater protection that New Mexico law provides from unreasonable searches and seizures involving automobiles.

## IV.   CONCLUSION

{50} We hold that the new crime exception to the exclusionary rule may apply to both violent and non-violent crimes committed in response to unlawful police action. Defendant's attempts to conceal his identity after the unlawful traffic stop sufficiently purged the taint of the initial illegality so as to render the exclusionary rule inapplicable under both the Fourth Amendment and Article II, Section 10 of the New Mexico Constitution. The evidence of the seat belt violation obtained as a direct result of the unlawful stop was correctly suppressed. Accordingly, we reverse the Court of Appeals and reinstate Defendant's conviction.

{51}   **IT IS SO ORDERED.**

30

_____
**PETRA JIMENEZ MAES, Justice**

**WE CONCUR:**

_____
**JUDITH K. NAKAMURA, Chief Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**CHARLES W. DANIELS, Justice**

_____
**BARBARA J. VIGIL, Justice**

31